**ANDERCO, INC., Plaintiff,**

v.

**BUILDEX DESIGN, INC., Defendant.**

**Civ. A. No. 81–2909.**

United States District Court,
District of Columbia.

May 14, 1982.

Thomas J. Gagliardo, Washington, D. C., for plaintiff.

William L. Stauffer, Jr., McLean, Va., for defendant.

## MEMORANDUM

GESELL, District Judge.

In this civil action tried to the Court, Anderco, Inc. (hereinafter "A"), sues Buildex Design, Inc. (hereinafter "B"), alleging breach of contract and, in the alternative, seeking quasi-contractual recovery to prevent B's unjust enrichment. B counterclaims for damages allegedly caused by A's breach of contract. For the reasons expressed in these findings of fact and conclusions of law, neither party is entitled to any recovery.

A is an established firm specializing in a form of foundation work known as grouting, which consists of pressurized injection of a cement-based mixture into the soil underlying a building for the purpose of arresting subsidence and in some cases actually raising foundation walls. In the summer of 1980, B, a small construction firm, entered into a contract with the Brazilian Embassy to stabilize and partially reconstruct a building in the District of Columbia known as the Brazilian Annex. The Annex was a relatively old building constructed in large part on filled ground. The structure had sunk on all four sides with the result that the floors bowed in the middle. B's task, among other things, was to stabilize the structure to prevent further sinking and to raise certain parts of the foundation, particularly the northeast corner, in order partially to alleviate the unevenness of the floors. This lawsuit arises from B's decision to ask A to perform this aspect of the job using A's grouting technique in lieu of alternative methods available.

During early August, 1980, Davis, a vice-president of A, and Downey, B's president, discussed the project in a number of conferences and telephone calls. On August 15, 1980, Davis submitted a written proposal to which was annexed a standard set of conditions. This proposal, to the extent here material, made no guarantee that efforts either to stabilize or lift the building would be successful, made no commitment as to time of completion of the job, and contemplated that the work would be billed at a per diem rate without any stated limitation on the total price of the job. After further conversations with Davis—the precise contents of which are hotly disputed—Downey sent Davis a telegram on August 25 indicating that A's proposal was accepted subject to "verbally agreed changes" and that a signed revision would follow. The next day Downey prepared and signed an edited version of A's written proposal to be mailed to Davis. The purport of the revision was to indicate that A was committed to stabilize the building and to lift the northeast corner by at least one and one-half inches and that the job would be undertaken in approximately ten days with a maximum payment of $20,000. A never received this document nor inquired why it had not been received as promised.

Both parties proceeded on the assumption that they had come to some type of agreement and work on the site commenced August 28. Although A was eventually able

to stabilize the perimeter of the building it was unable despite protracted effort to achieve the desired rise in the northeast corner of the building.[1] As the work proceeded A reported in writing daily to B and B therefore had full knowledge that A was proceeding without marked success. At the end of 11 days of work A billed B at the per diem rate in A's proposal and this work was paid for in the total amount of $9,936.75. B at no time indicated to A that it should stop working. Downey constantly reiterated, however, that B only had $20,000 to pay for the work. A never consented to a $20,000 cap and urged B to seek an adjustment in the contract price from the Brazilian Embassy which B consistently refused to do. After approximately 25 days of continuous work A concluded that it would not be possible to lift the building one and one-half inches and, requiring the equipment for another job, informed B that it was terminating work.

A contends it is entitled to payment under an alleged contract with B at the per diem rate indicated in the August 15 proposal for the full 25 days for which a total of $14,111.34 would be owing. It claims to have fulfilled its obligation to attempt to stabilize the building and to lift the northeast corner, that the total contract price was never limited to $20,000, and that it was not obligated to complete the work in ten days. B presents a radically different version of the contract. It contends that A is barred from any recovery because it failed to follow through on its commitment to lift the corner of the building and to complete the work within ten days and, in any event, A's claim exceeds the contract amount. B's counterclaim alleging that A's failure to complete the work within ten days and to raise the northeast corner caused it extra expense is consistent with this position.

The Court concludes that neither side has established their version of the contract. Indeed, no contract was ever formed since the parties never came to a meeting of the minds as to its essential terms. Accordingly, both A's claim for recovery in contract and B's counterclaim for alleged breach of contract must fail.[2]

The outlines of an agreement are contained in A's written proposal of August 15, 1982, and B's telegram of August 25 accepting the proposal subject to "verbally agreed changes." However, the testimony offered at trial clearly demonstrates that the parties had significantly different understandings of what Downey and Davis "verbally agreed" to in conversations between August 15 and August 25. The testimony of the two principals so lacks precision that it is impossible for the Court to determine the precise nature of the conversations. Davis, acting on behalf of A, believed that the parties' only oral modification of the written proposal was that A would receive payment for its services pursuant to a somewhat different timetable than indicated in the written proposal. This understanding is corroborated by the fact that Davis, upon receiving B's confirmatory telegram, sent a copy of the telegram to A's president and indicated in the margin that the "verbally agreed changes" referred to in the telegram related only to the payment schedule. Downey, on the other hand, believed that as a result of his conversations

1. The reasons why the grouting technique was unsuccessful in achieving the desired result were vigorously disputed at trial but are immaterial to the Court's resolution of this case. There is no claim A used improper methods or materials.

2. The parties have assumed that under District of Columbia conflicts rules District of Columbia law governs this action. A is a resident of Ohio and B is a resident of Virginia. The negotiations preceding the formation of the alleged contract occurred in Virginia, Ohio as well as the District of Columbia. Performance of the alleged contract occurred in the District of Columbia. In determining formation and validity of contracts the District of Columbia applies the law of the jurisdiction with the "more substantial interest in the resolution of the issue." *Owen v. Owen,* 427 A.2d 933, 937 (D.C.1981) (*quoting Fowler v. A & A Co.,* 262 A.2d 344, 348 (D.C.1970). While all three jurisdictions obviously have some interest in the resolution of this dispute the Court concurs in the parties' assumption that the District of Columbia has the more substantial interest.

with Davis A made the following specific guarantees: that the soil would be stabilized under the building on all sides, that the northeast corner of the building would be raised one and one-half to two inches, that the work could be completed for less than $20,000, and that the work would be completed in approximately ten days. Davis' view of the parties' verbal understanding also has some documentary support in the record. Downey's edited version of A's written proposal, which was apparently mailed to but never received by A, contains in substance all of the specific changes A claims were orally agreed to between Downey and Davis.

The bona fides of each party's version of the contract is underscored by their conduct in the course of actual performance. After work had been proceeding for more than ten days, Downey called Davis to inquire as to why the work had not been completed within that period and to reiterate that a total of only $20,000 had been allocated to pay for the work. Downey, for his part, steadfastly refused to acknowledge the $20,000 cap, insisting that B could and should request the Brazilian government to increase the contract price. Also, on September 15, A sent its first invoice to B, indicating that payment was being sought under "our Proposed Contract dated August 15, 1980." These actions clearly demonstrate that although both parties proceeded initially under the belief that they had a contract, their understanding as to the terms of that contract diverged in several key respects.

In order to form a contract it is necessary that the parties manifest their agreement or mutual assent to its essential terms. *Owen v. Owen*, 427 A.2d 933, 937 (D.C.1981); *Hollywood Credit Clothing Co. v. Gibson*, 188 A.2d 348, 349 (D.C.1963); *see also* 1 Williston on Contracts § 95 (3d ed. 1957); 1 Corbin on Contracts § 104 (1963). It is evident that in this instance there was no mutuality of assent. Moreover, there is no evidence tending to show that either party ignored the only reasonable interpretation of the words used or that either knew or had reason to know the intention or understanding of the other. *See* 1 Corbin on Contracts § 104 at 464 (1963). Under these circumstances A's written proposal of August 15, B's telegram of August 26, and the parties' intervening conversations do not make a contract.

Sometimes the course of the parties' performance will permit the Court to recognize an implied contract, *see Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir. 1973), or supply the missing terms of an indefinite contract, *see* 1 Corbin on Contracts § 101 (1963). But though a contract may be inferred from various facts and circumstances it must conform with all the elements of a binding agreement, 479 F.2d at 208, including the requirement of mutuality of assent, *see Martens v. Metzgar*, 524 P.2d 666, 672 (Alaska 1974); 1 Williston on Contracts § 3 at 11 (3d ed. 1957). Certain disputed elements of the parties' understanding can arguably be resolved based on the parties' conduct. For example, B's failure to terminate A after ten days of work might be interpreted as a tacit acknowledgement that the contract did not have a specific time limitation. Also, B's payment of A's invoice of September 15 could be taken as evidencing an agreement as to the per diem rate as well as the fact that A was not limited to ten days' work. Nevertheless, the record demonstrates that at least up until the time A abandoned the job the parties either had a mutual misunderstanding concerning or were actively disputing both the total contract price and the nature of the performance that had been promised. These facts demonstrate an absence of mutual assent and therefore a contract may not be found by implication.

In the absence of either an express or implied contract, A seeks recovery on its quasi-contractual claim on the theory "that the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should make restitution." *Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C.Cir.1973); *see also* 1 Corbin on Contracts § 19 (1963). The primary elements

of the work were to stabilize the soil around the perimeter of the building and to raise the northeast corner by one and one-half to two inches. It is conceded that A succeeded in stabilizing the soil and this was of benefit to B in carrying out its contract with the Brazilian Embassy. There is a substantial difference of opinion as to whether A succeeded in raising the building and, if so, how much. B acknowledges, however, that it failed to raise the level of the northeast corner a full one and one-half inches. Moreover, in weighing the conflicting testimony as to whether or not there was any movement the Court finds more credible the testimony offered on behalf of B, especially in view of the fact that the critical measurement relied on by A had to be taken using different benchmarks than were established at the beginning of the job. Thus the Court concludes that B received no benefit as a result of A's strenuous efforts to raise the northeast corner.

Based on the present record it is impossible for the Court to determine whether the $9,936.75 already received by A in partial payment for the work performed represents either more or less than the value of A's successful efforts to stabilize the foundation. Plaintiff has presented no proof as to how the $20,000—whether that amount is viewed as a cap or a mere estimate—was to be allocated among the various aspects of the job. Nor is there any evidence in the record of the reasonable value of A's partial performance based on any other standard. The appropriate result therefore is for the Court to leave the parties where it finds them.

Both the complaint and the counterclaim will be dismissed. An appropriate Order is filed herewith.