**In re Eugene O. & Jacqueline WRIGHT, Debtors.**

**Bankruptcy No. 84–00039.**

United States Bankruptcy Court, District of Columbia.

March 12, 1985.

Cecilie A. Vaughters, Washington, D.C., for debtors.

Morton A. Faller, Meyer, Faller, Weisman & Greenburg, Washington, D.C., for Teitel Financial Corp.

## OPINION AND ORDER

GEORGE FRANCIS BASON, Jr., Bankruptcy Judge.

This matter is before the Court for a final order on the motion filed by Teitel Financial Corporation ("Teitel") to modify the automatic stay in this case so as to permit Teitel to foreclose on the Debtors' residence.

The Debtors filed their Chapter 13 petition on January 26, 1984. On March 5, Teitel filed its motion for relief from the stay, reciting the Debtors' failure to make monthly payments due on the first day of each month from August 1983 onwards on Teitel's purported second trust on the

Debtor's residence, and reciting also that the Debtors owed a first trust of approximately $17,000, Teitel's purported second trust of $41,224.66 (including principal, interest, costs and attorneys' fees),[1] a third trust of $2,592.00, and a purported fourth trust of $14,310.00.[2] At the preliminary hearing, Teitel's appraiser valued the property at $68,000.00. The Debtor's schedules indicated a value of $72,000.00, but at the hearing they offered their opinion, based on the D.C. tax assessment, that the value was $74,151.00. Thus, Teitel was protected by a value cushion above its second trust of approximately $11,000.00 to $17,000.00. 11 U.S.C. § 362(d)(1). If there were indeed a fourth trust in the amount stated in the Debtors' schedules, the Debtors lacked any equity in the property.[3] 11 U.S.C. § 362(d)(2)(A). At the conclusion of the preliminary hearing, this Court had some doubts concerning the feasibility of the Debtors' then-proposed plan, but believed that it was reasonably likely either that events might turn out as favorably as the Debtors hoped, or (if not) that the Debtors could revise their plan so as to achieve feasibility. See 11 U.S.C. § 362(d)(2)(B). Therefore, the Court ordered the lift-stay motion scheduled for a separate final hearing. 11 U.S.C. § 362(e). Meanwhile, the Court required the Debtors to make monthly adequate-protection payments to Teitel in the amount of $362.50, the regular monthly payment amount set forth in the promissory note for the first year of Teitel's deed of trust.[4]

1. This is the figure set forth in the written motion. At the preliminary hearing, Teitel's bookkeeper testified that the amount due to Teitel through April 1, 1984, was somewhat less, that is, $40,104.35, based on Teitel's accounting sheets. The Court will rely on these accounting sheets as setting forth accurately Teitel's position.

2. Teitel garnered all of these figures (except those concerning its own deed of trust) from the Debtors' own schedules. However, at the hearing, the Debtor Eugene Wright testified that the schedules were in error; although he had intended to provide a fourth deed of trust to the party involved, in fact the debt to that party was unsecured.

3. *Ibid.*

4. As described at length below, the parties are in dispute as to the precise amount which the note prescribes for monthly payments thereafter, although both agree that the note prescribes some increase in the monthly amount. However, at the adequate-protection, lift-stay stage of a Chapter 13 or Chapter 11 case, this Court believes that no more than interest-only at the pre-maturity rate need ever be required, for property that is not depreciating or declining in value. *See In re Forest Hills Associates*, 40 B.R. 410 (Bankr.S.D.N.Y.1984), holding that 11 U.S.C. § 1124 permits a Chapter 11 debtor in its plan to deaccelerate a mortgage and hence obtain the benefit of the lower (6⅔% per year) pre-maturity interest rate and not have to pay the higher (2% per month) post-maturity inter-

At the conclusion of the final hearing, this Court took the matter under advisement because of continuing uncertainty as to the feasibility of the Debtors' plan in light of unfolding events and also because of substantial doubts concerning the validity of Teitel's security interest.

 Teitel introduced no new evidence at the final hearing concerning the purported fourth deed of trust. Therefore, the Court now holds that Teitel has failed to sustain its burden of showing lack of equity in the property, whether the property is worth $68,000.00, $74,151.00, or some intermediate figure. 11 U.S.C. § 362(g)(1). Thus, Teitel is not entitled to relief under 11 U.S.C. § 362(d)(2). Moreover, the substantial value cushion above Teitel's purported second trust, plus the Debtors' unrebutted testimony that the first and third trusts are current and that the first trust payments include taxes and insurance, plus the Debtors' Court-ordered monthly adequate-protection payments to Teitel, all together constitute fully adequate protection. Thus, Teitel is not entitled to relief under 11 U.S.C. § 362(d)(1).

 Teitel argues that monthly adequate-protection payments should be $870.00, not $362.50, because of an escalation clause in the promissory note. Teitel also argues that the Debtors are unable to propose a confirmable plan, because the Debtors' current proposed plan "is based upon an incorrect assumption" [5] and also because the Debtors' entire principal indebtedness to Teitel is now past due under the original terms of the note and deed of trust. *See* 11 U.S.C. § 1322(b)(2). For the

reasons set forth below, the Court rejects Teitel's contentions.

The history of the Debtors' relationship with Teitel is as follows: On August 21, 1981, the Montello Avenue Baptist Church ("the Church") obtained a loan in the face amount of $29,000.00 from a mortgage broker in order to complete construction of the church building.[6] As security for repayment of this loan the Debtors, who were the Church's pastor and his wife, (1) guaranteed repayment of the loan, and (2) placed a second trust on their personal residence. The loan was a one-year balloon obligation, with interest-only payments at the rate of 15% per year on the entire face amount of the loan being due monthly in the dollar amount of $362.50. The promissory note, no doubt prepared either by Teitel or by the mortgage broker Realty Investment Service, Inc. ("RIS"), incorrectly recites that the $362.50 included "principal & interest," rather than interest only. The Debtor Eugene Wright testified at the preliminary hearing that he and his wife did not know the monthly payments were for interest only or that what they had signed was a balloon note. The Court finds it incred'ble that they could have believed they could pay off a $29,000 obligation by making only twelve payments of $362.50 each. Nevertheless, the Court does credit this testimony to the extent of believing that, as a result in part of the false and deceptive recitation in the note that the $362.50 included "principal & interest," the Debtors believed they were agreeing to something different from interest-only monthly payments, followed by a "balloon"

---

est rate. *See also In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984).

5. The Debtors' plan was based on the hope that sale of the Montello Avenue Baptist Church property by the Church's trustee in bankruptcy would generate sufficient cash to pay a substantial amount to Teitel and to the Debtors in their capacities as general unsecured creditors of the Church. That hope has not been realized. However, for the reasons set forth below, this Court believes that the Debtors can most likely propose an amended plan which will be confirmable.

6. The actual amount advanced to the Church was substantially less than $29,000.00, according to the Debtor Eugene Wright's testimony. No doubt this was because of loan origination and broker's fees and other expenses. The promissory note is made payable to the order of Realty Investment Service, Inc. ("RIS"), and is endorsed over to Teitel without recourse by RIS, "by Max Kraft, President." Max S. Kraft is identified as "Broker" on RIS's letterhead. It is interesting to note that the deed of trust names "M.S. Kraft and J.N. Kraft" as Trustees.

payment of the entire face amount of principal at the end of one year.

On the same date as execution of the note and deed of trust, the Debtors received a "commitment" from the mortgage broker RIS "to extend the ... 2d Trust for a [second] period of one (1) year ... [if] [a]ll payments have been made on time and with no late fees [and upon] [p]ayment of the sum of $4,350.00, which will constitute the fee necessary to extend for the one year"; and "All other terms and conditions of the Trust will remain the same." However, the promissory note itself recites different terms for extension. In consecutive sentences it states:

This indebtedness may only be extended with the consent of the noteholder and in such event, there will be an extension fee of THREE (3%) per cent per month, payable each month in advance.

Any payment more than FIVE (5) days in arrears is subject to a late charge of 10%.

Review of Teitel's accounting sheets, introduced at the preliminary hearing through the testimony of Teitel's bookkeeper, reveals that, although the Debtors' payments were not "on time and with no late fees," Teitel did extend the term of the indebtedness for at least another year. Teitel apparently did not require payment of the $4,350.00 extension fee called for in RIS's commitment letter. Rather, Teitel interpreted the language in the note calling for an "extension fee of 3% per month" to require payment every month of 3% of the full principal face amount of the note, that is, $870.00 per month. Teitel interpreted the note to mean that this $870.00 would be payable instead of the previous monthly interest-only figure of $362.50. However, Teitel interpreted the very next sentence in the note, calling for a "late charge of 10%," to refer, not to 10% of the full principal face amount of the note, but to 10% of the regular monthly payment—that is, 10% of $362.50 prior to the original "balloon date"

(which Teitel's accounting sheets erroneously state to be September 17, 1982, rather than August 21, 1982), and 10% of $870.00 after the original balloon date. Thus, Teitel inconsistently interpreted these two adjoining sentences, interpreting the first sentence to refer to a percentage of the entire principal face amount of the note, and interpreting the second sentence to refer to a percentage merely of the monthly payment amount. Moreover, Teitel appears to have come rather late to its $870-per-month interpretation of the "3% extension fee" language. Teitel's own accounting sheet #1 shows the "monthly interest charge" for each month *through December 1982* to be $362.50, and the "penalties" (*i.e.*, late charges) to be $36.25 per month.[7] This, of course, is inconsistent with Teitel's present contention that payments after August 1982 were to be at the rate of $870.00 per month. It is true that a notation "9/17/82 New payment 870.00" appears in the bottom right corner of the sheet, and a similar, even more cryptic notation appears in the top right corner, but these notations appear obviously to have been made after the fact. For at the beginning of Teitel's accounting sheet #2, in the January 1983 column, appear first the carry-over balance from December 1982 as shown on sheet #1, and then notations of $507.50 for each of "Oct.," "Nov." and "Dec."—$507.50 is the precise amount of the difference between the original $362.50 monthly-payment amount and the $870.00 "3% monthly extension fee" amount which Teitel now claims was due after September 1982. The inference is strong that Teitel itself did not originally interpret the note to require payment of $870.00 per month after August or September 1982, and did not make that interpretation until sometime after its accounting sheets on this loan were first set up, and probably not until sometime during the last three months of 1982,

7. Through error, Teitel has affixed the wrong photocopy as the left-hand half of accounting sheet #1. The left-hand half of accounting sheet #1 is identical to accounting sheet #3, a single-page sheet showing figures for January—April 1984. The right-hand half of accounting sheet #1 shows figures for May—December 1982, and sheet #2 is a double-page sheet showing figures for January—December 1983.

at the earliest, or more likely as late as January 1983.

The Debtor Eugene Wright testified that he and his wife interpreted the "3% extension fee" language to mean that 3% of the monthly payment amount, or $10.88, was to be added to the monthly payment amount, for a total monthly payment during the second year of $373.38, for the privilege of extending the note beyond the original one-year term. This was certainly a reasonable interpretation for homeowners relatively unsophisticated in real estate transactions to make, especially in light of the fact that Teitel itself interpreted the very next sentence's "10% late charge" language in exactly the same way. In an attempt to show that the Debtors agreed to Teitel's interpretation of the "3% extension fee" language, Teitel points to a June 29, 1983 letter from Mr. Wright to Teitel's attorneys which includes the sentence: "Enclosed is my payment of $870.00 for the interest on my note for the month of June." However, this letter shows nothing about either party's interpretation when the note and deed of trust were executed nearly two years earlier, and it is entirely consistent with the Debtor Eugene Wright's testimony that he merely acquiesced in attempting (with limited success) to meet Teitel's demands for $870-per-month payments because he knew of no other way to save his home from Teitel's constant threats of imminent foreclosure. Having observed Mr. Wright's conduct and demeanor on the witness stand, the Court fully believes that the Wrights did indeed interpret the 3%-extension-fee language to require post-August 1982 monthly payments of $373.38 rather than $870.00. As noted above, the Court holds that this was a reasonable interpretation of that language.

If Teitel's interpretation of the 3%-extension-fee language is correct, then Teitel has driven an extremely hard—indeed an unconscionable—bargain, charging for the second year an interest rate of 36% per year on the face amount of the note. This probably works out to a true annual percentage rate on the amount actually advanced to the Church of 50% or more.[8] In addition, Teitel has included in the amounts it claims late charges of $36.25 per month for each month after the Debtors' first default prior to September 1982 and $87.00 per month for each month beginning in January 1983. These late charges are denominated as "penalties" in the testimony of Teitel's bookkeeper and on Teitel's accounting sheets. The Court can discern no reason to dispute this characterization, especially in the absence of any contrary evidence and in light of the short, five-day grace period and the high 10% rate at which the late-charge penalties were computed.

■ It is well settled in this jurisdiction that late charges which constitute penalties (that is, which have no reasonable relationship to any actual damages foreseeable at the time of contracting) are unconscionable and void. *Armfield v. Poretsky Mgmt., Inc.,* 112 Daily Wash.L.Rep. 2357 (Super. Ct.D.C., November 28, 1984) (Wolf, J.); *Willoughby Real Estate Co. v. Sanders,* 109 Daily Wash.L.Rep. 1149 (Super.Ct.D.C. June 11, 1981) (Schwelb, J.); *see Davy v. Crawford,* 79 U.S.App.D.C. 375, 147 F.2d 574 (1945) (described in *Armfield* as "[t]he seminal case [in this jurisdiction] in determining whether a liquidated damages clause constitutes a penalty" and hence is void and unenforceable).[9]

In view of the extremely divergent interpretations placed by the two parties upon the 3%-extension-fee language, and the rea-

---

8. *See* 15 U.S.C. § 1606 for definition of "annual percentage rate," as used in the federal Truth in Lending Act; *see also* D.C.Code § 28–3311 for incorporation by reference of the federal standard. No doubt in the instant case the precise amount of the true annual percentage rate can be computed from the settlement sheet on the loan closing.

9. Another clause which this Court regards as unconscionable is the clause providing for *"not less than* 15%" in attorneys' fees in the event of foreclosure, *in addition to* the standard provisions for 5% trustee's fee and all other costs and expenses of foreclosure (emphasis added).

sonableness of the Debtors' interpretation, it is clear that "the minds of the parties did not meet at all ... and that, therefore, there was no valid contract between them." Thus, this case is governed by *Lyon v. Smith*, 2 App.D.C. 37 (1893). Here, as there, "a most unconscionable advantage has been taken of the ignorance and necessities of the" borrowers. Here, as there, "[t]he jealous scrutiny with which a court of equity will regard transactions between a mortgagor and a mortgagee could not have better opportunity for application than this case." And here, as there, since there was "no actual contract, the parties are entitled to have the apparent contract rescinded and declared void."[10] 2 App. D.C. at 39.

Notwithstanding the passage of time since *Lyon v. Smith, supra,* the rule requiring a meeting of the minds in order to form a valid contract is, of course, still the law in this jurisdiction (as it is elsewhere). Thus, in *Andereo, Inc. v. Buildex Design, Inc.,* 538 F.Supp. 1139, 1142 (D.D.C.1982), District Judge Gesell held that there was no contract because there was no meeting of minds, stating:

> In order to form a contract it is necessary that the parties manifest their agreement or mutual assent to its essential terms. *Owen v. Owen,* 427 A.2d 933, 937 (D.C.1981); *Hollywood Credit Clothing Co. v. Gibson,* 188 A.2d 348, 349 (D.C.1963); *see also* 1 Williston on Contracts § 95 (3d ed.1957); 1 Corbin on Contracts § 104 (1963). It is evident that in this instance there was no mutuality of assent. Moreover, there is no evidence tending to show that either party ignored the only reasonable interpretation of the words used or that either knew or had reason to know the intention

or understanding of the other. *See* 1 Corbin on Contracts § 104 at 464 (1963).

In this case it is apparent that the Debtors, the lender and the broker were all concerned at the outset about whether the loan might be extended beyond its original one-year period, and if so on what payment terms. Obviously, for most borrowers it makes a crucial difference whether they must pay approximately $375 per month or $870 per month.

In this case, the Debtor Eugene Wright testified that he could afford to pay the smaller amount but not the larger amount. Events before and after the filing of the petition in this case vividly demonstrate the truth of that testimony. As of May 1982 the Debtors were one month behind in their $362.50-per-month payments, but they made catch-up payments in July, November and December 1982 totalling $4,335.00. If the Debtors' obligation is computed, in accordance with Debtors' interpretation,[11] at $362.50 per month through August 1982 and $373.38 thereafter, the Debtors had actually *overpaid* as of the end of December 1982 by more than a thousand dollars (*i.e.,* $1,028.98). They paid another $4,633.25 in 1983—$152.69 more than was due during that year,[12] according to their interpretation of the 3%-extension-fee language.

Thus, at the time they filed their Chapter 13 petition in January 1984, not only were the Debtors not in default, they had overpaid by $808.29, according to their reasonable interpretation of the agreed-upon language of the promissory note. According to Teitel's interpretation of the same language, the Debtors were in default on that date in the amount of $9,816.16—nearly ten thousand dollars. A difference of nearly $10,000 in computation of the amount due

---

10. Since there was no contract because there was no meeting of minds, it is not necessary to explore whether the transaction was also voidable for unconscionability. *See Greene v. Gibralter Mortg. Inv. Corp.,* 488 F.Supp. 177 (D.C.D.C. 1980); *see also Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (D.C.Cir.1965).

11. And disregarding the late charges, which (as noted above) are void as penalties, and also

disregarding $1,197.78 of attorneys' fees which Teitel charged against the Debtors' account without explanation or any justification appearing in the record of this case.

12. Again disregarding the late charges and attorneys' fees and the auctioneer's fees which Teitel assessed against the Debtors' account.

on a $29,000 note bespeaks a very substantial variance of interpretation.

Moreover, the consequences of this variance are even more drastic than the $10,000 amount itself. Teitel had twice commenced foreclosure proceedings, which were aborted only by the filing of first the Church's and then the Debtors' bankruptcy petitions. By contrast, except for one brief and promptly-cured lapse in September—October 1984, the Debtors have kept up the court-ordered $362.50-per-month payments from April 20, 1984 through the date of this Opinion and Order. Thus, it is obvious that the amount of the monthly payment was an essential element of the parties' purported agreement: if the amount was in the range of $375 per month, the Debtors could afford it and could save their home from foreclosure; if the amount was $870 per month, the Debtors could not afford it and their home would eventually be foreclosed.

Therefore, although the parties agreed upon the 3%-extension-fee language of the promissory note, they each reasonably [13] understood that language to mean something entirely different. Neither party had reason to know the intention or understanding of the other, until after the first year of the note and deed of trust had elapsed. In conclusion, this Court holds that because there was no meeting of the minds there was no contract, and the Debtors are entitled to rescind the entire transaction.

A question remains concerning terms of rescission. In *Andereo, Inc. v. Buildex Design, Inc., supra,* Judge Gesell allowed retention of partial payments already received by the plaintiff contractor, on the theory of unjust enrichment, but he refused to allow further compensation for additional work because the defendant property-owner "received no benefit as a result of [the contractor's] strenuous efforts." 538 F.Supp. at 1143. In this case it is not clear to this Court whether the Debtors should be regarded as merely accommodation obligors who received no benefit at all from the funds advanced to their Church, or whether they should be regarded as having received full or partial benefit of the entire amount received by the Church from the date of its receipt—perhaps on the theory that the pastor of a church, who may receive his livelihood largely or entirely from donations by church members, makes an "investment" in a completed church building from which he hopes and expects to derive future income in the form of bigger donations to the church from a larger number of church members. If the Debtors received no benefit, then they are entitled to rescind the transaction, including Teitel's purported security interest, without payment of any amount to Teitel. If the Debtors received some benefit, then they are entitled to propose a Chapter 13 Plan which will pay off the value, as of the effective date of their Plan, of whatever amount that benefit is hereafter determined to be, over a period of up to five years.[14] 11 U.S.C. § 1325(a)(5)(B)(ii).

The determination of what benefit, if any, the Debtors received as a result of Teitel's loan to the Debtors' Church cannot and need not be decided now. The parties

---

13. The Court has explained why it has no doubt that the Debtors' interpretation was reasonable. Although the Court regards the bargain which Teitel sought to impose as being unduly harsh, the Court believes that the words which Teitel (or RIS) chose to express the terms of that bargain are reasonably susceptible to the meaning that Teitel ascribes to them. Thus, Teitel's interpretation too was "reasonable." Indeed, to hold otherwise would be to penalize the party who interpreted the language reasonably by denying that party relief against the party whose interpretation was not reasonable—surely a perverse result, to be avoided.

14. Section 1322(b)(2) is no impediment to confirmation in a case where the obligation to pay is not contractual but rather arises solely out of an equitable obligation to avoid unjust enrichment. In such a case a bankruptcy court, being a court of equity, can permit the debtor to pay over a period of time pursuant to an equitable repayment schedule, rather than requiring the entire amount to be paid at once, especially in view of the overall rehabilitative purposes and the specific deferral-of-payment provisions of Chapters 11 and 13.

may agree upon a figure, or either party may file an adversary proceeding so as to obtain a judicial determination concerning "the validity, priority or extent of" Teitel's purported lien. Bankruptcy Rule 7001(2). For the present, it is sufficient if the Debtors continue their $362.50 monthly adequate-protection payments to Teitel.

Since the Debtors will need to file an amended plan, the confirmation hearing has by separate order been postponed. If either party files an adversary proceeding such as is described above, the confirmation hearing may be further postponed until after that adversary proceeding is concluded.

NOW THEREFORE IT IS ORDERED that the motion by Teitel Financial Corporation for relief from the automatic stay is DENIED;

PROVIDED that the Debtors shall continue adequate-protection payments to Teitel at the rate of $362.50 per month until further order of this Court, in default of which Teitel may renew its motion for relief from the automatic stay.