**AMERICA FIRST INVESTMENT CORPORATION, Appellant,**

v.

**Michael GOLAND and Balboa Construction Co., Inc., Appellees.**

**No. 89–7253.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 5, 1990.

Decided Feb. 22, 1991.

David G. Leitch, with whom George H. Mernick, III, Washington, D.C., was on the brief, for appellant.

David I. Gelfand, with whom Seth P. Waxman, Washington, D.C., was on the brief, for appellees.

Before SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

The question presented by this appeal is whether Balboa Construction Company (Balboa) agreed to pay America First Investment Corporation (AFIC) a fee for securing financing, the bulk of which Balboa never utilized. The district court granted summary judgment to Balboa on the ground that the contract between Balboa and AFIC is unambiguous and sustained Balboa's interpretation as a matter of law. The district court concluded alternatively that, even if AFIC could establish that the contract is ambiguous, the ambiguity would evidence only that there had been a mutual misunderstanding and a failure to contract. We reverse and remand.

## I.

In 1986, Balboa sought to expand its self-storage mini-warehouse business into the Washington metropolitan area. To obtain adequate financing for this project, Balboa's president and sole shareholder, Michael Goland, contacted Michael Steed, AFIC's president. Goland and Steed entered into a loan brokerage agreement which provided that AFIC, an investment and brokerage firm, would use its best efforts to secure a financier willing to loan $30 million to Balboa and, in return, Balboa would pay AFIC one percent of the "loan amount" secured by AFIC. *See* Joint Appendix (JA) 7.

Steed soon found a financier for Balboa—Dominion Federal Savings and Loan Association (Dominion). Although Dominion was not willing to loan the full amount Balboa requested, it was willing to loan $12 million, payable in installments of not more than $3.5 million. Balboa agreed to these terms and signed a formal "loan commitment" contingent on Dominion making certain amendments to the terms of the agreement. Balboa, however, was not satisfied with the amendments Dominion offered and the Dominion commitment fell through.

Before the collapse of the Dominion deal, Goland and Steed finalized the terms of their agreement in a letter that was signed by both parties. JA 23. In pertinent part, the letter stated:

It is our agreement that if AFIC presents to Goland lenders who provide all or a portion of $30 million or more of acceptable loans that you [Goland] will pay to AFIC a fee of 1% of the loaned amount. This fee is earned in full by AFIC when Goland receives an acceptable commitment from a lender and is payable, ratably, upon the funding of the commitment. Should the loan not be funded, in whole or in part, for any reason, then AFIC shall be paid their fee upon maturity of the commitment or one year from that loan commitment date, whichever occurs first. Furthermore, Goland agrees to pay to AFIC the sum of $10,000 as a portion of the fee earned at the time that the loan commitment is accepted, if the loan commitment is for a loan requiring a term different than an immediate funding.

Regarding the Dominion deal in particular, the letter provided that Goland would "pay $75,000 of the fee upon the first funding." Because the loan commitment was canceled, Balboa never paid this amount to AFIC.

Next AFIC introduced Balboa to Balcor Real Estate Finance, Inc. (Balcor). Balboa and Balcor signed a Master Loan Agreement, by which Balcor agreed to extend $30 million in credit to Balboa. The Master Loan Agreement expressly referred to the $30 million amount as the "commitment" and set forth the terms and conditions governing the funding of individual loans. As soon as the Master Loan Agreement was finalized, Balboa received its first loan from Balcor, amounting to $2.1 million. In turn, on receiving the loan funds, Balboa promptly paid $21,000 to AFIC—its one percent commission. Several months later,

Balcor again made a loan to Balboa, this time for $1.55 million. Again Balboa promptly paid AFIC $15,500 when it received the loan funds.

Balboa then ran into serious financial difficulties and defaulted on both loans. Consequently Balboa stopped attempting to obtain financing for further projects. One year from the date Balboa entered into the Master Loan Agreement with Balcor, AFIC demanded that Balboa pay its one percent commission on the portion of the loan commitment that had not been funded (*i.e.*, $30 million less $3.65 million). Balboa refused to do so and this lawsuit followed. AFIC is a Delaware corporation with its principal place of business in the District of Columbia. Goland is a California resident and Balboa is a California corporation with its principal place of business in California. Accordingly suit was brought pursuant to the court's diversity jurisdiction, 28 U.S.C. § 1332(a).

The district court found that the contract between AFIC and Balboa was plain on its face and therefore could be interpreted as a matter of law. The court focused primarily on the single sentence stating that Balboa "will pay to AFIC a fee of 1% of the loaned amount." "Loaned amount," reasoned the court, should be given its ordinary meaning, namely the amount of money actually loaned to Balboa. Once the court determined this sentence was clear and controlling, it read the subsequent sentences so they comported with that sentence. In particular, the court concluded that "commitment" did not refer to the type of commitment described in the Master Loan Agreement between Balboa and Balcor, but instead referred to a "commitment to make a loan." JA 227. Also the court reasoned that "commitment" was relevant only insofar as it related to the timing of the brokerage fee and therefore did not render ambiguous the fee amount. Finally, the court concluded that the Balcor–Balboa Master Loan Agreement did not "commit" Balcor to do anything and therefore the terms of the AFIC–Balboa agreement could not be ambiguous. The district court did not explain why it looked to the Balcor–Balboa contract in order to determine the ambiguity *vel non* of the AFIC–Balboa agreement.

In addition to the district court's "plain meaning" interpretation of the contract, the court held that AFIC could not recover under the contract because AFIC could, at most, prove only that there had been a mutual misunderstanding of an essential fact. The court decided that AFIC's interpretation of the contract, even if it were accurate, would create an irreconcilable contradiction between the terms "loaned amount" and "commitment." This contradiction, concluded the court, "would evidence a lack of agreement over an essential term and therefore a failure to contract." JA 227–28. The court did not explain why an ambiguity on the face of the contract necessarily evidences a mutual misunderstanding; presumably, the court meant that AFIC presented no evidence that would allow it to find that the two parties had a common understanding of the contract's terms.

## II.

■ The heart of the matter is whether the AFIC–Balboa brokerage agreement is unambiguous on its face.[1] If the contract is unambiguous, the court can interpret it as a matter of law. *See Horn & Hardart Co. v. National Railroad Passenger Corp.*, 793 F.2d 356, 359 (D.C.Cir.1986); *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C.Cir.1985); *Davis v. Chevy Chase Financial Ltd.*, 667 F.2d 160, 169 (D.C.Cir. 1981). Even a cursory reading of the agreement reveals that the meanings of "loaned amount" and "commitment" are unclear. The contract provides in one sentence that the fee is to be based on the "loaned amount" while in a later sentence it states that "[t]his" fee is earned in full when Goland receives an "acceptable commitment." These two sentences, if given

1. The parties assume that District of Columbia law governs and we agree. *See Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1030 n. 22 (D.C.Cir.1974); *Kass v. Norwitz Co.*, 509 F.Supp. 618, 623 (D.D.C.1980).

their ordinary meaning, seem to lead us in very different directions. As the district court noted, the term "loaned amount" appears to mean what it says: that the fee is to be determined according to the amount of the individual loans as they are made. "Commitment," on the other hand, appears to refer to Balcor's commitment to extend credit to Balboa—not to the specific loans extended by Balcor.[2] When these provisions are read together they produce an absurd result: the contract would provide that the fee must be based upon actual loan amounts but that the fee is earned in full before any of these amounts are determined. Adding to the confusing terminology, the contract states that a fee must be paid even when the loans are not funded or when the loans are not funded immediately. This provision, too, seems to indicate that the fee is to be based on the total loan commitment, not on any specific loaned amount.

To harmonize the language, each party argues that we should focus on one of the two key terms—"loaned amount" or "acceptable commitment"—and define the other according to the chosen term. AFIC would have us focus on "commitment" and read "loaned amount" so that it refers to the total amount committed to be loaned (*i.e.*, $30 million).[3] On the other hand, Balboa asks us to focus on the sentence that provides the fee is to be determined according to the "loaned amount" and construe "commitment" so that it reads "loan commitment." Indeed this is the interpretation the district court adopted.

Underlying both of the parties' arguments is the notion that the court should first choose the defining term in the contract and then read the contract so that all of the terms are "harmonized" with that term. This theory would, in effect, require us to determine what the contract means *before* we can determine whether the contract is plain on its face. We reject this circular approach to contract interpretation. While the parties are correct that courts must attempt to harmonize the terms of a contract and read the terms in a way that makes them consistent, *see 1010 Potomac Associates v. Grocery Mfrs. of America, Inc.,* 485 A.2d 199, 205 (D.C. 1984); *Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359, 366 (D.C.1984); *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* 345 A.2d 456, 461 (D.C.1975); *Kass v. William Norwitz Co.,* 509 F.Supp. 618, 624 (D.D.C.1980), they go astray when they interpret this doctrine to mean that courts must go so far as to purge the contract of all ambiguity in the pursuit of "harmony." Balboa argues in its brief (without supporting authority) that "if there is *any* reading of the other sentences of the parties' agreement that renders them consistent with the plain meaning of 'loaned amount' in the fee provision, the Court should accept this consistent reading." The point missed is that this argument harms Balboa as much as it helps. The court could just as readily first interpret "acceptable commitment" and then read the contract so that it is consistent with that term. The only difference between these alternatives is the starting point of the court's inquiry.

We conclude that the terms of the AFIC–Balboa contract cannot be reconciled without resort to extrinsic evidence. We see no reason to focus at the summary judgment stage on "loaned amount" and redefine the other terms of the contract so that they become consistent with that term. The interpretation proffered by Balboa—that we should read "commitment" to refer to individual loan commitments, not the overall credit commitment—is by no means the

---

2. Balboa, in its brief, claims that the "Master Loan Agreement does not obligate Balcor to do anything" and therefore cannot be considered a "commitment." Were we to accept Balboa's assertion that the Agreement is not an enforceable contract, this conclusion would not preclude us from finding that it nonetheless constitutes a "commitment" within the meaning of the brokerage agreement.

3. On appeal, AFIC argues that the court erred in granting Balboa's motion for summary judgment, but does not argue that the trial court erred in denying its motion for summary judgment. Consequently AFIC does not argue that "loaned amount" is unambiguous; instead it argues that this term *could* refer to the total loan commitment.

only interpretation consistent with the plain meaning of the words chosen by the parties. At the very least, "commitment" is ambiguous and could have been used to refer to Balcor's Master Loan Agreement with Balboa. Because the terms "loaned amount" and "commitment" are not free from ambiguity, the contract cannot be interpreted as a matter of law and the case must be remanded so that the fact-finder can determine the parties' true intent.

### III.

 A subsidiary issue is whether AFIC presented sufficient evidence to survive summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (nonmoving party must make showing sufficient to establish existence of each essential element that party must prove to prevail). As this court recently stated, summary judgment may be appropriate in a contract case even if the contract is ambiguous so long as there is no evidence that would support a conflicting interpretation of the agreement. *Farmland Industries, Inc. v. Grain Board of Iraq,* 904 F.2d 732, 736 (D.C.Cir. 1990). Here the district court concluded that AFIC could at best prove only that there had been a mutual mistake as to an essential fact. Although the court does not expressly explain how it reached this conclusion, it presumably reasoned that AFIC provided no evidence manifesting that Goland, Balboa's president, intended the contract to mean what AFIC claims it means. After a careful review of the record, we conclude that AFIC did produce evidence to support its interpretation.

To survive summary judgment, AFIC must be able to point to some evidence in the record that would allow a reasonable fact-finder to conclude that both parties signed the contract with the understanding that Balboa was obligated to pay a fee based upon the overreaching "loan commitment." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Balboa claims that AFIC produced no evidence that Goland shared Steed's understanding of the agreement as set forth in Steed's letter demanding payment from Balboa. JA 80. Steed's own understanding of the contract terms, claims Balboa, is insufficient to prove Goland's intent.

While Balboa is correct that Steed's understanding of the contract terms is insufficient to establish Goland's understanding, this is not the only evidence AFIC adduced. In addition, AFIC pointed to Balboa's aborted deal with Dominion which provided that Dominion would not loan more than $3.5 million to Balboa in any single transaction. JA 9. Yet the AFIC–Balboa contract expressly provides that Balboa was to pay $75,000 to AFIC as an initial fee for the Dominion deal. Because $75,000 far exceeds one percent of $3.5 million, this evidence suggests that Balboa understood that it would be paying AFIC more than one percent of any single "loaned amount."

Next, AFIC points to an earlier draft of the brokerage agreement. JA 7. That draft originally provided that the one percent commission would be "payable in full to AFIC in cash when Goland receives an acceptable commitment from a lender." In handwriting, however, the parties changed "payable" to "earned" so that the agreement provided that the commission "is earned in full by AFIC when Goland receives an acceptable commitment from a lender." In addition, the parties added that the commission would be "payable upon funding of the commitment." These changes appear to support AFIC's claim. The change making the commission "earned" in full—and not merely "payable" —at the time an acceptable commitment is received could reasonably support the conclusion that the commission is to be calculated according to the total loan commitment. Likewise, the change providing that the commission may be paid when the "commitment" is funded could also support that conclusion. When we view these changes in the light most favorable to AFIC, as we must, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513, we conclude that AFIC has thus produced sufficient evidence to avoid summary judgment.

In sum, the AFIC–Balboa contract is not free from ambiguity and the district court erred in construing it on summary judgment. Accordingly, the judgment is

*Reversed and Remanded.*