COUNTRY CLUB ASSOCIATES
LIMITED PARTNERSHIP,
et al., Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.

No. 93–1781.

United States District Court,
District of Columbia.

Feb. 14, 1996.

Burton A. Schwalb, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, for plaintiff.

Katherine Newman, Robert Wilson Hawkins, Huton & Williams, Allen Scott Rugg, Washington, DC, for defendant.

## *OPINION*

PAUL L. FRIEDMAN, District Judge.

Country Club Associates Limited Partnership was formed to construct a residential community with a Robert Trent Jones golf course, a tennis facility and a clubhouse, to be called Virginia Oaks.[1] To finance the project it entered into a $57 million Loan Agreement with Home Federal Savings and Loan Association ("HFSL"). After construction on Virginia Oaks had begun and Country Club had drawn down more than $23 million under the Loan, the Office of Thrift Supervision ("OTS") declared HFSL insolvent. The OTS appointed the Resolution Trust Corporation ("RTC") as Receiver for HFSL, chartered a new institution called HomeFed to purchase the assets and assume some of the liabilities of HFSL, and then appointed the RTC as Conservator of the newly-formed HomeFed.[2] After the RTC took over the management of HFSL and HomeFed and redistributed the two institutions' financial obligations, the RTC refused any further advances of Country Club Loan funds, and work on Virginia Oaks ceased.

---

1. The plaintiffs in this case are Country Club Associates Limited Partnership, R–B Investment Corporation ("R–B") and SBC Investment Corporation ("SBC"), the sole general partners of Country Club Associates Limited Partnership. Plaintiffs collectively will be referred to as "Country Club."

2. On December 31, 1995, the RTC ceased to exist in accordance with the provisions of the Resolution Trust Corporation Completion Act, 12 U.S.C. § 1441a(m)(1). The Federal Deposit Insurance Corporation was substituted for the RTC as a defendant by operation of law pursuant to that Act.

Country Club filed this action against the RTC as Receiver, the RTC as Conservator, and certain other defendants who have since been dismissed by stipulation. Country Club claims that the RTC breached the Loan Agreement, caused the Virginia Oaks project to fail and caused plaintiffs to suffer financial losses in the millions of dollars. Before the Court are cross motions for summary judgment.

## I. BACKGROUND

There is no dispute about many of the facts underlying this lawsuit. In May 1989, Country Club executed a Loan Agreement in the amount of $57 million with HFSL. Defendants' Statement of Material Facts ("Defs.' Statem.") ¶ 1; Plaintiffs' Statement of Material Facts ("Pls.' Statem.") ¶¶ 1, 3. The purpose of the Loan was to finance the acquisition and development of an upscale residential community in Virginia to be called Virginia Oaks. Defs.' Statem. ¶ 2; Pls.' Statem. ¶¶ 2, 3. For its part, Country Club executed two promissory notes, one in the amount of $44 million and the other in the amount of $13 million, each of which it secured by a deed of trust. Defs.' Statem. ¶ 3; Pls.' Statem. ¶ 3. R–B and SBC, the sole general partners of Country Club Associates Limited Partnership, contributed $6 million of equity to the Country Club Partnership. Pls.' Statem. ¶ 4. The $57 million Loan was at least partially guaranteed by Bressler & Reiner, Inc., which plaintiffs assert is a limited partner of Country Club and the corporate parent of one of Country Club's general partners. Defs.' Statem. ¶ 4.

After obtaining the Loan, Country Club acquired real estate and began to develop Virginia Oaks. It requested and received from HFSL extensions of the maturity date of the Loan until June 1, 1993. Defs.' Statem. ¶¶ 6, 7; Pls.' Statem ¶¶ 5, 6. By the end of June 1992, HFSL had advanced $23 million to Country Club under the Loan Agreement. Defs.' Statem. ¶ 8; Pls.' Statem. ¶ 5.

On July 6, 1992, the Office of Thrift Supervision declared HFSL insolvent and placed it into receivership with the RTC as Receiver. Defs.' Statem. ¶ 9; Pls.' Statem. ¶ 7. On the same date, OTS chartered HomeFed, placed HomeFed into conservatorship and appointed the RTC as Conservator. Defs.' Statem. ¶ 10; Pls.' Statem. ¶ 7. The RTC as Receiver of HFSL and the RTC as Conservator of HomeFed entered into a Purchase and Assumption Agreement on July 6, 1992, which transferred certain HFSL assets, including some "loans," from HFSL to HomeFed. Defs.' Statem. ¶ 11; Pls.' Statem. ¶ 8. The Assumption Agreement also obligated the RTC as Conservator of HomeFed to assume certain of HFSL's existing liabilities. Defs.' Statem. ¶ 13; Pls.' Statem. ¶ 8.

Within 45 days of the institution of the HFSL receivership, Country Club submitted two requisitions for funds under the Loan Agreement. The RTC declined to provide the funds. Country Club followed up each draw request with a letter from its attorneys indicating that it viewed the RTC's failure to honor the draw requests as a material breach of the Loan Agreement. Declaration of Burton Reiner ("Reiner Decl."), Exs. 14, 18. Without funds, all construction on the Virginia Oaks project soon ceased. Defs.' Statem. ¶¶ 14, 15, 22; Pls.' Statem. ¶ 9. Country Club was not in default at the time the RTC declined to make funds available under the Loan Agreement. Pls.' Statem. ¶ 6; Defs.' Reply Mem. in Support of Summ.J. at 5.[3]

Country Club sued the RTC as Receiver of HFSL and as Conservator of HomeFed. Country Club moved for partial summary judgment on liability, claiming that the RTC is liable either for breach of contract or for statutory repudiation based on its refusal to honor the Country Club Loan. The RTC cross-moved for summary judgment, arguing principally that it had no continuing obligation to disburse Loan funds to Country Club and, even if such an obligation existed, it fell on the RTC as Receiver of HFSL rather than on the RTC as Conservator of

---

3. The RTC subsequently sold the Country Club promissory notes and deed of trust to Sun NLF Limited Partnership. The notes were resold to Virginia Oaks L.P., a third party. Country Club, the Loan guarantors and Virginia Oaks L.P. eventually reached a settlement that resolved the obligations of the plaintiffs and the guarantors under the notes.

HomeFed. The practical result of such an allocation of liability would be that any judgment obtained by Country Club would be against an entity with empty pockets. The Court finds that there is no genuine dispute that the RTC improperly terminated the Loan Agreement without providing Country Club with notice and an opportunity to cure a possible budget imbalance. It concludes that Country Club is entitled to judgment as a matter of law on the liability issue and that the RTC as Conservator of HomeFed is accountable for that breach of contract.

## II. DISCUSSION

### A. The Breach of Contract Claim

■ When the RTC takes over an institution, either as Receiver or Conservator, it assumes the preexisting obligations of the failed institution and thus is susceptible to claims that it breached those obligations. 12 U.S.C. § 1821(d)(2)(H); *see Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1274–75 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 317, 130 L.Ed.2d 279 (1994). The parties do not dispute that the RTC assumed the contractual obligations contained in the Country Club Loan Agreement, but the RTC disputes whether those obligations continued and in what capacity it took over any continuing obligations related to the Loan. *See infra* section II.D.

■ The elements of a breach of contract claim under Virginia law are (1) a legal obligation of a defendant to a plaintiff; (2) a violation or breach of that duty; and (3) consequential injury or damage to the plaintiff. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316 (1989).[4] It is undisputed that there was a valid Loan Agreement providing for funds to be disbursed to Country Club to finance the Virginia Oaks Project, that plaintiffs made draw requests under that Agreement on July 15, 1992 and on August 27, 1992, and that they followed up with letters from their attorneys on August 3, 1992, and September 14, 1992, stating that the RTC's failure to honor the draw requests constituted a material breach of the Agreement and that, in the absence of Loan funds, construction on Virginia Oaks would come to a standstill. Reiner Decl., Exs. 13, 14, 17, 18. It also is undisputed that the RTC refused to honor Country Club's requests, but the record is devoid of any contemporaneous explanation from the RTC for its refusal.

■ Since the failure by a party to a contract to do what it is contractually bound to do is a breach of contract, *see, e.g., Harrison Higgins, Inc. v. AT & T Communications, Inc.*, 697 F.Supp. 220 (E.D.Va.1988), and the RTC failed to honor Country Club's loan draw requests, plaintiffs claim that they are entitled to summary judgment on their breach of contract claim. On the other hand, the RTC argues that it is entitled to judgment as a matter of law because its obligation to advance funds under the Loan Agreement ceased after plaintiffs concealed from HFSL relevant facts concerning the state of the Virginia Oaks budget.

■ Under Rule 56, Fed.R.Civ.P., summary judgment shall be granted if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. "In cases in which the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous." *Davis v. Chevy Chase Financial Ltd.*, 667 F.2d 160, 169 (D.C.Cir.1981); *see America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C.Cir.1991). Furthermore, it is settled that whether a contract term is ambiguous is a question to be determined by the court. *Carey Canada, Inc. v. California Union Ins. Co.*, 708 F.Supp. 1, 4 (D.D.C.1989). In this case, the Court finds that the pivotal provisions of the Loan Agreement between HFSL and Country Club are not ambiguous.[5]

---

4. The Loan Agreement specifies that it shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the Commonwealth of Virginia. Reiner Decl., Ex. 1 ¶ 8.12.

5. On this point, the parties agree, as defendants put it, that "there are only legal arguments at issue in this case, not facts. The documents say what they say...." Defs.' Reply Mem. at 14 n. 4.

■] The RTC argues that it had no legal obligation to continue to disburse funds to Country Club under the Loan Agreement. Its defense against plaintiffs' breach of contract claim rests on a provision of the Loan Agreement that provides in relevant part as follows: ·

> The Lender shall not be obligated to make any advance of loan proceeds ... unless ... the Lender shall be satisfied, based upon the advice of the Consulting Engineer or Progress Inspector, that the Project (or any phase of the Project) can be completed with the balance of the loan proceeds then held by the lender and available for advance pursuant to the terms of this Agreement. ...

Reiner Decl., Ex. 1· ¶ 2.4(c).

The RTC asserts that at the time plaintiffs submitted their requests for funds on July 15, 1992 and August 27, 1992, plaintiffs were concealing a Loan imbalance of the type described in paragraph 2.4(c) of the Loan Agreement. As proof, the RTC relies on an April 7, 1992 letter from James F. Cain, Senior Asset Manager at an HFSL subsidiary, to one of Country Club's limited partners and a June 1992 Virginia Oaks Priority Action List prepared by Country Club representatives that was uncovered by the RTC during discovery. The April 7, 1992 HFSL letter from Mr. Cain concerns a budget revision for the Virginia Oaks project. It states:

[HFSL] is advancing the funds requested in your last advance based upon your representations concerning the Project and your commitment to our engineer that there are adequate funds available in the Loan to complete the Project. ...

Declaration of Mark Morgan, Ex. F.[6] The June 1992 Priority Action List states:

> [The] HomeFed budget is $44 million. Realistic budget is $64–69 million as currently planned, resulting in need to generate approx. $7.95 to $13 million from sales proceeds.

> \*   \*   \*   \*   \*   \*

> The loan is not in balance. [Country Club] must fund costs (as incurred) until the loan is back in balance before HomeFed has any further obligation to fund, if there are insufficient funds to complete the project.

Defs.' Ex. C at 4–5.[7]

In the Court's view, these documents do not raise a genuine issue of fact concerning an asserted effort by Country Club to conceal a budget imbalance. When read in full, the April 7, 1992 letter from HFSL recognizes that the Virginia Oaks budget and plans for the Project's clubhouse were revised by Country Club and that these steps were taken to ensure that the loan remained in balance. Rather than suggesting concealment, the April 7, 1992 letter suggests frank communication between Country Club and HFSL regarding the budget situation.

---

**6.** With its Reply, the RTC appends a July 16, 1992, independent appraisal of the Virginia Oaks project, which it insists was the "first hard evidence received by the lender that the Loan was out of balance and the project could not be completed with the funds available under the loan." Defs.' Reply Mem. in Support of Summ. · J. at 4 n. 1 and Ex. 1. The property appraisal evaluated the Virginia Oaks site "as is"—that is unfinished—and found the property to be worth $10.4 million in its partially developed condition. How the property's value at that time inevitably leads to the conclusion that the project could not be completed with the balance of Loan funds is unclear.

In addition, plaintiffs have provided the Court with an April 28, 1992, appraisal that was provided to the same James F. Cain who authored the April 7, 1992 letter to the Country Club limited partner (discussed in the text) accepting that available Loan funds *were* adequate to complete the Virginia Oaks project. That appraisal supplied a range of estimated property values for Virginia Oaks from $5.39 million (pessimistic scenario) to $9.55 million (probable scenario) to $30.52 million (optimistic scenario). Pls.' Supplemental Submission Ex. A.

**7.** Defendants also rely on a draft May 20, 1992 Development Plan for the Virginia Oaks project and an attached analysis prepared for Country Club by Sequoia Investments, Inc. The analysis estimates the total project costs to be $65 million with $7.95 million in costs not covered by the HFSL Loan. Defs.' Ex. B at Tab 5. The Development Plan recognizes that the lender has no obligation to honor Loan draws while the Loan is out of balance. References to the year 1991 in the analysis and an attached list of project cost categories indicate that the analysis was prepared well before the time that the RTC took over HFSL. The Court, therefore, considers this evidence irrelevant.

Nor is the Country Club Priority Action List evidence that could persuade a trier of fact that Country Club was engaged in an effort to conceal an imbalance. The List, which is dated May 1992, is a planning document. It recommends cost reductions and changes in the scope of the Virginia Oaks Project to remedy an imbalance and measures to improve the Project's cash flow. The Priority Action List outlines tasks to be accomplished, the goal and target date for completion and the names of the person or persons responsible for accomplishing the tasks. The List is part of an attempt to prevent or cure an imbalance. It is not evidence that an imbalance existed at the time of the unsatisfied draw requests that were made, respectively, one month and two and a half months after the date of the List.

■ Moreover, even if the List could be said to be evidence of an imbalance at the time the draw requests were made, at most it is evidence that defendants had a right to temporarily suspend payment of a draw request as permitted by paragraph 2.4(c) of the Agreement, not the right to terminate. HFSL's right to terminate the Agreement arises only if Country Club engaged in a "default event." In order for the type of budget imbalance alleged by defendants to be considered a "default event" it must last for 30 days. Reiner Decl., Ex. 1 ¶ 6.4. In such circumstances, the Agreement gave HFSL the right to "terminate [the] Agreement by notice in writing to the Borrower...." *Id.* at ¶ 7.0. The Court is not persuaded that defendants have offered any evidence of an imbalance at the time of the draw requests, let alone an imbalance that continued for 30 days. Finally, even if the April 7, 1992 letter and the Priority Action List are viewed as such evidence, the Court finds that the RTC failed to take the steps required under the Agreement to terminate.

■ Under Virginia common law, the termination of a contract is only permitted "when the [non-breaching party] has suffered a breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the object of the parties." *R.W. Power Partners, L.P. v. Virginia Elec. and Power Co.,* 899 F.Supp.

1490, 1496 (E.D.Va.1995) (quoting *Neely v. White,* 177 Va. 358, 366–67, 14 S.E.2d 337 (1941)). " '[A]lthough a material breach justifies the injured party in suspending performance, it does not of itself justify the injured party in terminating the contract. Fairness ordinarily dictates that the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can.' " *Id.* (quoting Farnsworth on Contracts, Total Breach and Termination § 8.18; citing, *inter alia, Citizens Home Ins. Co., Inc. v. Glisson,* 191 Va. 582, 61 S.E.2d 859, 861 (1950)).

■ The requirement that a party provide notice of default and at least a brief opportunity for the other party to cure its breach of a contract protects against unnecessary disruption in business. Parties to a lending agreement such as the Country Club/ HFSL Loan count on the agreement enduring long enough for the project for which the funds are being borrowed to be realized. They will order their conduct accordingly and rely on the agreement in planning related transactions. Thus, it makes sense that notice and an opportunity to cure are required unless "the parties, by agreement, abrogate such common law principles...." *R.W. Power Partners, L.P. v. Virginia Elec. and Power Co.,* 899 F.Supp. at 1495 (citing, *inter alia, L & E Corp. v. Days Inns of America, Inc.,* 992 F.2d 55, 58 (4th Cir. 1993)). An agreement to displace firmly rooted principles of contract law requiring notice and an opportunity to cure can only accomplish that objective if "it admit[s] of but one interpretation: that a breach—whether material or otherwise—may be the basis for termination." *R.W. Power Partners, L.P. v. Virginia Elec. and Power Co.,* 899 F.Supp. at 1501. No such agreement exists in this case.

The Loan Agreement is consistent with established principles of Virginia contract law. Paragraph 2.4(c) of the Loan Agreement provides a right to suspend payment of a draw request if available funds under the Loan are insufficient to complete the Project, but it does not provide a right to terminate the Loan Agreement without notice. Paragraph 7.0 permits termination of the Agreement by the Lender and, in accordance with

Virginia common law, it requires notice prior to termination. It states that the "Lender shall have the right, upon the happening of any Event of Default, to terminate this agreement by notice in writing to the Borrower." As to when an imbalance constitutes an "Event of Default," paragraph 6.4 explains that the imbalance must continue for a period in excess of 30 days. Reiner Decl., Ex. 1 ¶¶ 2.4(c), 6.4, 7.0.

In this case, the RTC repeatedly refused to honor draw requests. Despite Country Club's inquiries and accusations that the RTC was in breach of the Agreement, the RTC did nothing to inform Country Club of the reason for its refusal. Whether or not the RTC had a reason to ignore Country Club's entreaties, the Court finds that the RTC's conduct effected a termination of the Loan Agreement without notice of default as required by the Agreement. The Court therefore concludes that the RTC terminated the Country Club Loan Agreement improperly under the Agreement and that its conduct constitutes a breach of its legal obligation to plaintiffs. *R.W. Power Partners, L.P. v. Virginia Elec. and Power Co.,* 899 F.Supp. at 1501–02; *City of Richmond v. A.H. Ewing's Sons, Inc.,* 201 Va. 862, 114 S.E.2d 608, 611, 613 (1960); *see Sun Village Farms v. Bowery Savings Bank,* 735 F.Supp. 945, 948 (D.Ariz.1990).

### B. Damages

In order to be successful on their breach of contract claim, plaintiffs must not just prove a breach; they must also prove that they were injured by the breach and are entitled to damages. *Westminster Investing Corp. v. Lamps Unlimited, Inc.,* 379 S.E.2d at 316. The RTC argues that plaintiffs' claim must fail because they cannot prove any damages. The losses identified by plaintiffs include their anticipated profits, an initial $6 million equity investment made by the general partners of Country Club in the partnership, and $3.5 million paid to the purchasers of the Country Club loan as part of a settlement agreement.

Actual lost profits generally are available to a plaintiff as damages in the successful prosecution of a claim for a breach of contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351 (1979). Such damages may not be awarded, however, where the award would be based on an estimate of lost profits that is speculative. *Id.* at § 352. For this reason, the RTC contends that plaintiffs are not entitled to recover either their anticipated profits or the $6 million investment in the project that would only have been recouped if Country Club made a profit from the Virginia Oaks Project. *See Mullen v. Brantley,* 213 Va. 765, 195 S.E.2d 696, 700 (1973); *Coastland Corp. v. Third Nat. Mort. Co.,* 611 F.2d 969, 977 (4th Cir.1979).

The Court agrees that any estimates of lost profits related to the Virginia Oaks Project—a new, undeveloped business—would be based on speculation and conjecture. *See Joyce v. Lincoln Nat. Life Ins. Co.,* 845 F.Supp. 353, 355 (E.D.Va.1993); *Carley Capital Group v. City of Newport News,* 709 F.Supp. 1387, 1398 (E.D.Va.1989). Plaintiffs cannot prove their entitlement to expectation damages or what those damages would have been. This action therefore will not proceed to trial for a determination of lost profits. That leaves the question of what measure of damages is appropriate.

Plaintiffs claim that they are entitled to reliance damages totaling $9.5 million. Six million dollars of that claim relates to an equity contribution from R–B and SBC to the Country Club partnership that arose from a commitment letter between the parties and that is incorporated into the Loan Agreement. Reiner Decl., Ex. 1 at Ex. B; Reiner Decl., Ex. 31. The commitment letter specifies that as a condition precedent to the closing of the Loan, HFSL was entitled to

> [s]uch written evidence as [HFSL] may require to the effect that [Country Club] has raised the amount estimated by [HFSL] to complete all work over and above the amount of the loan.... [HFSL] estimates [Country Club's] equity requirement to be $6,000,000.00.

Reiner Decl., Ex. 31 ¶ 10(*o*); Reiner Decl., Ex. 1 at Ex. B; Pls.' Statem. ¶ 4. Plaintiffs assert and defendants do not dispute that the $6 million contribution was in fact made in 1989. *See* Defs.' Mem. at 10.

The remaining $3.5 million of the claim includes $2.5 million that was paid by Bressler & Reiner, Inc., to Virginia Oaks, L.P., the third-party purchasers of the promissory notes, deed of trust and guarantees by Bressler & Reiner and Sequoia Building Corporation. A $1 million promissory note also was provided by Bressler & Reiner to those purchasers. These payments were both made in exchange for a release from liability related to obligations arising out of the Virginia Oaks project. Reiner Decl., Ex. 28 at 2, 3. Plaintiffs contend that they are entitled to recover the $3.5 million because Bressler & Reiner is a limited partner in Country Club and the corporate parent of R–B (which is a general partner of Country Club) and that the $3.5 million was contributed for the benefit of Country Club.

Defendants, on the other hand, contend that the only damages available in the event of a breach of a loan agreement is the difference in the interest rate that the parties initially agreed upon and the interest rate at the time of the breach over the life of the loan, discounted to present value. Plaintiffs assert that no alternative financing was available to them.

Upon careful consideration of the entire record in this action, the Court concludes that there are material issues of fact in dispute concerning the proper measure of damages and whether expenditures made by nonparty Bressler & Reiner are recoverable.

### C. Statutory Repudiation

In the alternative, plaintiffs have argued that the RTC is liable because it failed properly to repudiate the Loan Agreement between HFSL and Country Club, see 12 U.S.C. § 1821(e)(1), and therefore that plaintiffs are entitled to recover "actual direct compensatory damages." 12 U.S.C. § 1821(e)(3)(A)(i). Plaintiffs' claim for failure to follow statutory repudiation requirements assumes that the RTC had a statutory obligation to repudiate the Loan Agreement. The statute provides, however, that "the conservator or receiver for any insured depository institution *may* disaffirm or repudiate any contract or lease" so long as certain procedures are followed. 12 U.S.C. § 1821(e)(1)

(emphasis added). In this case, the RTC denies that it statutorily repudiated the HFSL–Country Club Loan Agreement—that is, it did not exercise its option to repudiate—and there is no evidence in the record to the contrary. The failure to statutorily repudiate a contract results in a continuation of the contractual obligation and the application of contractual principles to the dispute. Accordingly, plaintiffs' motion for summary judgment on their statutory repudiation claim is denied.

### D. Proper Defendant

The RTC next argues that even if it had a continuing obligation to disburse Loan funds to Country Club, that was the obligation of the RTC as Receiver of HFSL and not of the RTC as Conservator of HomeFed. The Court disagrees.

The loan obligation undisputably originated with HFSL. On July 6, 1992, the RTC as Receiver of HFSL took over the loan obligation when it was appointed Receiver of HFSL. On that same day, however, the RTC as Receiver of HFSL entered into a Purchase and Assumption Agreement with the RTC as Conservator of the newly chartered HomeFed, which transferred certain assets and liabilities from HFSL to HomeFed. Defendants insist that the Purchase and Assumption Agreement did not transfer continuing obligations under the Loan from HFSL to HomeFed. Plaintiffs argue just the opposite. The answer to the dispute lies in the language of the Purchase and Assumption Agreement. See *FDIC v. Marine Midland Realty Credit Corp.*, 17 F.3d 715, 720 (4th Cir.1994) (language of agreement is determinative of the liabilities of the RTC as Conservator and as Receiver); see also *Resolution Trust Corp. v. United Trust Fund, Inc.*, 57 F.3d 1025, 1031 (11th Cir.1995).

The Purchase and Assumption Agreement transfers "the assets and certain liabilities of" HFSL to HomeFed. Reiner Decl., Ex. 11 at 2. It includes an Article containing definitions, an Article related to the purchase of assets and an Article related to the assumption of liabilities. In the Article concerning the purchase of assets, the Agreement provides for the purchase of "loans."

*Id.* at ¶ 3.1(d). The definition of "loans" excludes "the unfunded portion of any loan with respect to which there is a binding commitment of [HFSL] to provide additional funding...." *Id.* at ¶ 1.11. In the Article concerning the assumption of liabilities, the agreement provides that the RTC as Conservator of HomeFed assumes "liabilities for indebtedness secured by mortgages, deeds of trust...." *Id.* at ¶ 2.1(b). There is no corollary definition that excludes unfunded portions of "liabilities for indebtedness."

Since assets are the converse of liabilities, and the Purchase and Assumption Agreement provides for the purchase of "assets" and the assumption of "certain liabilities," the language and structure of the Purchase and Assumption Agreement indicate that the purchase of assets and the assumption of liabilities are separate arrangements. In this case, the Agreement indicates that assets such as loans, including the Country Club loan, would be purchased by HomeFed with the exception of the unfunded portion of the loan with respect to which HFSL was still obligated to provide additional funding. Reiner Decl., Ex. 11 ¶ 3.1(d) and ¶ 1.11. Standing on their own, therefore, the assets provisions suggest that HomeFed did not purchase the obligation to continue to fund the Country Club Loan.

■ Turning to the provisions governing the assumption of liabilities, however, the Agreement also provides for the assumption of "liabilities for indebtedness" which are secured by a deed of trust.[8] HFSL's obligation to Country Club under the Loan Agreement was a "liability" on the part of

HFSL, and the Loan itself is an indebtedness secured by a deed of trust. As used here, the term "for" serves the function of introducing the nature of or the reason for the "liability." Read as a whole, the phrase "liability for indebtedness secured by ... [a] deed[ ] of trust" encompasses HFSL's obligations concerning the Country Club Loan. The Court concludes that the Country Club loan fits the description of a liability assumed by the RTC as Conservator of HomeFed and that the RTC as Conservator of HomeFed therefore assumed the liability of continuing to fund plaintiffs' loan.[9]

### E. Proper Plaintiffs

■ R–B and SBC Investment Corporations are general partners of Country Club. They are not independent parties to the Loan Agreement. Defendants contend that R–B and SBC are not proper plaintiffs in this action.

■ Under Rule 17(b), Fed.R.Civ.P., the capacity to sue of a partnership or unincorporated association such as R–B or SBC is determined by the law in the District where the court sits. *National R.R. Passenger Ass'n v. Union Station Assocs. of New London,* 643 F.Supp. 192, 193 (D.D.C.1986). In this case, District of Columbia law is determinative.

The settled rule in the District of Columbia is that a partnership is not a jural entity capable of suing or being sued. *Shoreham Hotel Ltd. Partnership v. Wilder,* 866 F.Supp. 1, 3 (D.D.C.1994); *Anderson v. Hall,* 755 F.Supp. 2, 4 (D.D.C.1991). Therefore,

---

8. At argument, defendants maintained that this assumption of liabilities provision pertains only to the bank's own indebtedness. Nowhere in the Purchase and Assumption Agreement is section 2.1(b) limited to the bank's own indebtedness. *See FDIC v. Marine Midland Realty Credit Corp.,* 17 F.3d at 720 (reasoning assumes that the term "liabilities for indebtedness" is not limited to the bank's own indebtedness).

9. On December 3, 1993, subsequent to the filing of this lawsuit, the OTS placed HomeFed into receivership. The RTC as Conservator for HomeFed Bank, F.A. has moved to substitute the RTC as Receiver for HomeFed Bank, F.A., asserting that "[t]he [RTC] as Receiver for HomeFed, has succeeded to the responsibilities of the RTC as Conservator." *See* Defs.' Mot to Substitute at

¶ 5; 12 U.S.C. § 1441(a)(1)(3)(B). For reasons that should be clear from the Court's analysis of the Purchase and Assumption Agreement, plaintiffs object to substitution unless defendants explicitly represent that the RTC as Receiver of HomeFed has assumed and succeeds to all of the responsibilities, liabilities and obligations of the RTC as Conservator of HomeFed. Plaintiffs suggest that the Court add the RTC as Receiver of HomeFed as an additional defendant. The Court agrees that plaintiffs are entitled to the assurances they seek so that they will not be forced to relitigate the question of who holds the obligation to Country Club. Accordingly, the Court denies the RTC's motion to substitute party-defendant.

individual partners have been held to be proper and perhaps necessary plaintiffs in any lawsuit brought by a partnership. *Id.* Accordingly, defendants' motion for summary judgment against R–B Investment Corporation and SBC Investment Corporation on the grounds that they lack standing to pursue this matter is denied.

Defendants have also moved to strike portions of the complaint or to compel amendment of the complaint. The Court largely agrees with plaintiffs that there is no need to require amendment of the complaint. Insofar as plaintiffs do not object to the removal of certain paragraphs of their complaint, however, the Court will grant in part the motion to strike portions of the complaint.

■ Finally, plaintiffs and Country Club's limited partners, Bressler & Reiner, Inc., and Sequoia Building Corporation (who are alleged to be the corporate parents of the general partners), filed a second civil action against the RTC as Receiver for HFSL, the RTC as Conservator of HomeFed and the RTC as Receiver of HomeFed, *see Country Club v. Resolution Trust Corporation,* Civil Action No. 95–0090 (PLF), and have moved to consolidate the two actions for all purposes. Defendants oppose consolidation.

Civil Action 95–0090 essentially duplicates this action, with the exception of the addition of Bressler & Reiner, Sequoia and the RTC as Receiver for HomeFed as parties. According to plaintiffs, subsequent to the filing of this action, they received and filed proof of claim forms with the RTC related to the Loan Agreement which have now been disallowed. They claim that they filed the second action seeking review of the disallowance of their claim pursuant to 12 U.S.C. § 1821(d)(6)(A) in order to ensure that no claim against the RTC has been waived.

Rule 42(a) of the Federal Rules of Civil Procedure provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning

proceedings therein as may tend to avoid unnecessary costs or delay.

The Court finds that Civil Action 95–0090 and this virtually identical action involve common questions of fact and law. The question is whether, now that the Court has resolved the dispositive motions in this action and is entering judgment for plaintiffs on the liability issue, any purpose is served by consolidating the two actions and, indeed, whether there are any issues remaining to be resolved in Civil Action 95–0090. Accordingly, the Court directs plaintiffs, either to voluntarily dismiss Civil Action No. 95–0090 or to supplement their motion to consolidate with a memorandum addressing what purpose will be served by consolidating Civil Action 95–0090 with this action and whether any claims remain unresolved in Civil Action 95–0090. Defendants shall have an opportunity to respond to plaintiffs' supplemental memorandum.

## III. CONCLUSION

For all the foregoing reasons, the Court grants judgment on the liability issue for Country Club Associates Limited Partnership. An Order consistent with this Opinion is issued this same day.

SO ORDERED.

## *ORDER*

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that plaintiffs' motion for partial summary judgment on breach of contract grounds [34–1] is GRANTED. Judgment on liability is entered for Country Club Associates Limited Partnership against the RTC as Conservator of HomeFed; it is

FURTHER ORDERED that plaintiffs' motion for summary judgment on statutory repudiation grounds [34–2] is DENIED; it is

FURTHER ORDERED that defendants' motion for summary judgment [36–1] is DENIED; it is

FURTHER ORDERED that defendants' motion to substitute party defendant [37–1] is DENIED; it is

**440**

FURTHER ORDERED that defendants' motion to strike portions of the complaint [38–1] is GRANTED in part and DENIED in part. Paragraphs 16, 20, 21, 22, 23 and the third, fourth and fifth sentence of paragraph 7 are stricken; it is

FURTHER ORDERED that defendants' motion to compel amendment of the complaint [38–2] is DENIED; it is

FURTHER ORDERED that, on or before March 1, 1996, plaintiffs shall either voluntarily dismiss Civil Action 95–0090 or file a supplemental memorandum in support of their motion to consolidate this action with Civil Action 95–0090 in which they will address the purpose to be served by consolidation at this stage in the litigation and whether any issues remain to be resolved in Civil Action 95–0090. A response, if any, shall be filed by defendants on or before March 15, 1996; it is

FURTHER ORDERED that, on or before March 15, 1996, the parties shall each file a status report (or, if feasible, a joint status report) with the Court addressing whether they wish to brief damages issues, whether they are interested in alternative dispute resolution or a settlement conference with a magistrate judge, and whether this case is ready to be scheduled for pretrial conference and trial, as well as a proposed schedule for further proceedings in this case; and it is

FURTHER ORDERED that this case is scheduled for a status conference on March 19, 1996, at 9:00 a.m.

SO ORDERED.