**In re Barbara ROTHENBERG, Debtor.**

**David A. ROLL, Receiver, ex rel. Ralph D. Kaiser Company, Inc., a District of Columbia Corporation, Plaintiff,**

**v.**

**Barbara ROTHENBERG et al., Defendants.**

**Bankruptcy No. 88–00754. Adversary No. 95–0075.**

United States Bankruptcy Court, D. Columbia.

Sept. 3, 1996.

Howard Teller, Rockville, MD, for Barbara Rothenberg.

Marc Albert, Trustee, Tyler, Bartl, Burke and Albert, Alexandria, VA.

Nelson C. Cohen, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC, for Allen W. Rothenberg.

Emil Hirsch, Freedman, Levy, Kroll & Simonds, Washington, DC, for David A. Roll, Ralph D. Kaiser Company, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING INTEREST OWED TO ALLEN ROTHENBERG

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This decision addresses what interest is owed on a promissory note held by Allen Rothenberg which is secured by a deed of trust on the home of his former wife, Barbara Rothenberg, the debtor.[1] The plaintiff

---

1. The court held a trial on this matter on March 19, 1996. The court heard evidence and the argument of counsel. The court did not express-ly decide the factual issues at trial except to reject Allen Rothenberg's testimony as less reliable than that of Dennis Santoli and asked the

is David A. Roll, receiver of the Ralph D. Kaiser Company, Inc. ("RDK"), which holds Barbara Rothenberg's deed of trust on the home which is junior to Allen Rothenberg's deed of trust. Whatever interest is owed Allen Rothenberg diminishes the amount which Roll can recover from the home pursuant to RDK's junior lien.[2]

Subject to the later resolution of an issue concerning the Statute of Frauds, the court concludes:

(1) By oral agreement, the note bears interest post-maturity on the unpaid amount owed at maturity at "the highest legal rate."

(2) The oral agreement for interest at "the highest legal rate" is not limited by D.C.Code § 28–3303(1) to 6 percent because the usury statute does not apply to post-maturity interest.

(3) The parties intended the highest legal rate which could be expressed in writing when the note was executed, i.e., 8 percent per annum, to be the applicable highest legal rate.

(4) The interest is due in annual installments.

(5) The note specifies that each installment of interest is to bear interest at "the highest legal rate." This is a limited form of compounding, with each annual installment of interest bearing interest at "the highest legal rate" but without such additional interest being compounded in the future.

(6) "The highest legal rate" for computing interest on installments of interest is the maximum legal rate that could be expressed in writing when the note was executed, i.e., 8 percent per annum.

(7) Any expenditures by Allen Rothenberg to protect or enforce his deed of trust, including his attorney's fees, are to bear interest, after making demand on Barbara Rothenberg for reimbursement thereof, at the highest legal rate in effect on the date of demand but without compounding of interest.

## I. INTERPRETATION ISSUES REGARDING NOTE AND DEED OF TRUST OTHER THAN MEANING OF "THE HIGHEST LEGAL RATE"

### A. The Meaning of the Note as explained by its Drafter

Allen Rothenberg and Barbara Rothenberg were husband and wife and owned a residence ("Property") located at 12 Logan Circle, N.W., Washington, D.C. They decided to get divorced and entered into a written property agreement (the "Agreement") on December 23, 1976.

Under the Agreement Allen Rothenberg conveyed his interest in the Property to Barbara Rothenberg. In turn, Barbara Rothenberg agreed to give Allen Rothenberg $50,-000 to consist of $23,500 in cash, stocks and bonds, and $26,500 as follows:

Five Thousand Dollars ($5,000.00) not later than December 31, 1977; Ten Thousand Dollars ($10,000.00) not later than December 31, 1978; approximately Eleven Thousand Five Hundred Dollars ($11,500.00) or the balance due to make the total of Fifty Thousand Dollars ($50,000.00). To be secured by a second trust on 12 Logan Circle, Washington, D.C. Amounts due to be adjusted by cost-of-living changes from date of settlement to date of payment.

Agreement par. 12. As was made clear by a later promissory note, the parties intended the last installment to be paid on December 31, 1979.

The Agreement included what is often called an integration clause, providing that:

The parties have incorporated in this Agreement their entire understanding. No oral statement or prior written matter

---

parties to file further briefs. The court has now reviewed those briefs.

**2.** Roll seeks a determination of the amount of interest and other charges owed on Allen Rothenberg's claim, the appointment of a receiver to enforce RDK's deed of trust, and an injunction against Allen Rothenberg enforcing his claim. This decision addresses only the question of interest owed Allen Rothenberg. This decision does not address the two other matters. Allen Rothenberg has filed a Motion to Determine Fees and Costs Secured by Deed of Trust. In its post-trial brief, the plaintiff has asked the court to address anew the question of whether to enjoin Allen Rothenberg from enforcing his deed of trust.

extrinsic to this Agreement shall have any force or effect. The parties are not relying upon, and specifically herein repudiate, any representations other than those expressly set forth herein. All prior agreements between the parties, whether written or oral, are hereby revoked and held for not.

Agreement par. 25.

Allen Rothenberg's office colleague, Dennis R. Santoli, a non-practicing lawyer, assisted in the drafting of the Agreement, not representing either side because the parties wanted an amicable divorce. Santoli had no extensive experience in drafting divorce agreements. According to Santoli, the language regarding the consumer price index ("CPI") was to insure that Allen Rothenberg was made whole pending receiving payments in full by December 31, 1979, but it was not intended to give him a profit.

On January 31, 1977, Barbara Rothenberg executed a deed of trust note (the "Note") payable to Allen Rothenberg. The Note was a Washington Law Reporter Form 213 Deed of Trust Note. Santoli, who prepared the Note, typed interlineations in the form in order to carry out what he understood was the agreement between Allen and Barbara Rothenberg based on meetings with the two. The Note reads, in the pertinent part, as follows:

35 months after date Barbara Levitt Rothenberg promises to pay to the order of Allen W. Rothenberg the sum of twenty five thousand seven hundred seventeen and 48/100 dollars, for value received with interest at –0– per centum per annum until paid, payable $5,000.00 December 31, 1977; $10,000.00 December 31, 1978; $10,717.48 plus an amount equal to the increase in the consumer price indexes on unpaid balances from December 31, 1976. Each installment of interest to bear interest after maturity, if not paid, at the highest legal rate.

According to Santoli, whereas the property Agreement had not addressed the question of interest after the final installment was due to Allen Rothenberg, the parties reached agreement in that regard in discussions which led to the promissory Note and the deed of trust.[3] Specifically, Allen Rothenberg was not to be entitled to have interest accrue on the Note before the maturity date of December 31, 1979. Rather, the discussion was that he would simply be made whole via the provision for CPI adjustments, without making a profit as long as the Note was paid on the maturity date. Regarding what would happen after the maturity date, the parties orally agreed that Allen Rothenberg would no longer simply be made whole. Rather, he would be entitled to receive interest, with interest compounded annually on that interest, at the highest legal rate. The intention was that the provision regarding adjustments for the CPI would cease to run after the Note's maturity date and that interest would then commence.

Santoli looked to the deed of trust itself, executed on the same date as the Note, January 31, 1977, as providing for interest and as expressing its rate. Specifically, the deed of trust, again a Washington Law Reporter form, provides:

That he [meaning Barbara Rothenberg] will pay the indebtedness evidenced by the note secured hereby, all taxes and assessments relating to the land and premises herein described, ground rents, all charges against the property, and all other sums which are required to be paid by him under the terms of said promissory note or this Deed of Trust, including costs, expenses and attorney's fees incurred by the Trustees or the holder of said note with respect to this trust, the said note or the land and premises herein described, and in default of any such payment the holder of said note may pay the same, and any sum or sums so paid shall be added to the debt hereby secured, shall be payable on demand, shall bear full legal interest, and shall be secured by this Deed of Trust.

Deed of Trust, par. 1.

Santoli obviously misunderstood this deed of trust provision. It only applies to

---

**3.** Santoli's testimony regarding what was said in those discussions is not "rank hearsay" as urged by the plaintiff because the testimony was received not for the truth of what was said but for the purpose of ascertaining what the parties intended. For example, whether Allen Rothenberg truthfully stated that he wanted a profit on the Note after maturity is not an issue, but that he said this is relevant to fixing the terms of the Agreement.

amounts that Allen Rothenberg had to pay with respect to protecting his interests under the deed of trust. There is no evidence that Allen Rothenberg paid any principal or interest on the Note that he himself held, and it would not have made sense for him to make such payments. From a common sense perspective, it is obvious that the provision is not aimed at defaults in paying principal and interest. Rather, the provision is aimed at the secured party's having to expend funds in protection of the deed of trust. Such expenditures are payable only on demand and, hence, ought to bear interest only from the date of demand for payment.

Santoli's erroneous view of what the deed of trust's language provided does not mean that no interest is owed. The Note itself is still ambiguous, and the court may receive Santoli's testimony to explain that ambiguity. Santoli's mistaken interpretation of the deed of trust does not alter the parties' intention that there was to be interest charged after the Note matured.

Furthermore, the conclusion that the parties intended that the Note bear interest after maturity is not negated by an alteration to the recitals of the deed of trust form. Form language in the recitals referring to interest on the principal amount has been stricken. The alteration deleted the reference to interest because until maturity the Note was not to be an interest-bearing note. It does not establish that interest was not to begin accruing after maturity. To construe the striking of the language otherwise would be at variance with the provision in the Note which clearly contemplates that some form of interest is to be paid.

Santoli's testimony explains why the Note refers to interest being added to interest when the Note provides that zero percent interest is to be paid. The provision for zero interest was only directed to the pre-maturity period. The parties agreed orally that interest was to be paid on the Note after it matured, and Santoli saw no reason to mention that anew in the Note because he thought that the deed of trust specifically provided for interest after maturity.

The parties' oral agreement was that the post-maturity interest rate was to be "the highest legal rate." The Note itself does not state what interest rate the obligation was to bear after maturity (except for the interest rate on installments of interest), because Santoli thought that the deed of trust itself provided for such interest in its provision for interest at "the full legal rate."

The Note is further ambiguous in referring to "each installment of interest," when it does not specify any installments of interest either before or after maturity. In Santoli's and Allen Rothenberg's experience interest was compounded annually. That is how all the business deals they had worked on were done. Santoli testified that the parties agreed to annual compounding in his presence. Finally, the Note was payable in installments before maturity on December 31 of each year. This suggests that the parties would have viewed the sums due on the Note post-maturity as calculable on an annual basis. So "installment of interest" simply means an annual accumulation of interest.

Based on Santoli's testimony, interest was to accumulate annually on both principal and CPI adjustments owed as of maturity. The parties intended the unpaid balance owed at maturity to be a new CPI-adjusted principal balance so that the principal balance would take into account inflation between December 31, 1976, and December 31, 1979, the date of maturity.

There remains the issue of whether interest accruing on interest was itself to bear interest. The Note's reference to "each installment of interest" referred to interest running after maturity on the amount owed at maturity. If each annual installment of such interest was not paid, that installment itself was to bear interest, but there was no provision in the Note for that interest on interest itself to bear interest. The Note itself thus provided a limited form of compounding, but not full compounding. Although the parties discussed compounding of interest, the obligor, Mrs. Rothenberg, could view the Note as expressing the full extent of the parties' oral agreement for compounding, and the court will not vary the terms of the Note, which provided for a limited form of compounding, to provide instead for full com-

pounding. Any oral agreement for compounding was itself ambiguous, and the written Note is the most persuasive evidence of what the Rothenbergs intended when they agreed to compounding.

### B. Meaning of "Full Legal Interest" on Expenditures Made to Protect Lien

With respect to payments of attorney's fees or other expenditures that Allen Rothenberg made to protect his collateral and for which he demanded payment from Barbara Rothenberg, the provisions of the deed of trust apply. It is not clear from the language itself what interest rate the parties intended to apply. The term "full legal interest" does not necessarily mean the same as "highest legal rate." The term "full legal interest" could be read as meaning the statutory rate for promissory obligations when the parties' contract fails to specify the interest rate. Under D.C.Code § 28–3302(a), "[t]he rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6 percent per annum." On the other hand, the term could be read as meaning the maximum, or "full," interest rate. The court finds the term ambiguous and finds that the proper resolution is to give credence to Santoli's view that the language was providing for "the highest legal rate."

### C. Reasons for Crediting Santoli's Testimony

As will be seen in Part III, the court declines to give credence to Santoli's testimony regarding what the parties meant by "the highest legal rate." But the court does credit his testimony in other respects. There are several reasons to give credence to his testimony.

First, Santoli was not as emotionally involved in the transaction as the Rothenbergs, and he had a clearer recollection of the events.

Second, although he is a friend of the Rothenbergs, his demeanor was frank and he has no financial stake in the outcome.

Third, there has obviously been no collusion between Santoli and Allen Rothenberg because they did not agree in their recollections on whether the CPI adjustments were to cease upon maturity.

Fourth, the Note itself screams out as an incredibly ambiguous instrument raising numerous questions as to what the parties were attempting to accomplish. Santoli's testimony supplies answers to these questions explaining why the Rothenbergs adopted the language used. His erroneous view when he drafted the instruments that they clearly express the Rothenbergs' intention does not destroy his credibility, even though it is surprising that he could have held that view.

Fifth, the Note on its face seems to say both that it is not to bear interest and that it is to bear interest. That seeming inconsistency is easily resolved through Santoli's interpretation. His interpretation limits the provision for no interest to the pre-maturity period in which the parties agreed that CPI adjustments would stand in place of ordinary interest. His interpretation then limits the reference to interest to the post-maturity period. In construing contractual language, "an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983); *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 277 (4th Cir.1987); *Clyburn v. 1411 K Street Ltd. Partnership*, 628 A.2d 1015, 1018 (D.C.1993) ("A contract must be interpreted as a whole ... No language therein should be viewed as redundant").

Sixth, District of Columbia law provides that when money is lent and there is no express provision for interest, interest nevertheless shall be added to the amount owed, and the rate of such interest is specified by statute. D.C.Code § 28–3302(a). Even without Santoli's testimony, the court would be inclined to find that after maturity the Note was to bear interest. It is doubtful that the parties would have agreed that after maturity no interest was to be charged, particularly because they referred to installments of interest in the Note.

Finally, the Note provided for interest on each installment of interest at the highest legal rate. It would make little sense for the Rothenbergs to have agreed to post-maturity interest on interest at the highest legal rate but for them to have agreed to limit themselves to post-maturity interest at the statutory rate (of 6 percent per annum) on the balance owed at maturity.

### D. *Reasons for Not Giving Weight to the Inconsistent Statements or Testimony of Allen and Barbara Rothenberg*

The court has given due consideration to Allen and Barbara Rothenberg's testimony and their prior statements regarding what they thought was owed. Their testimony and statements are inconsistent with what Santoli testified to.

Barbara Rothenberg's schedules filed in the main bankruptcy case commenced in 1988 reported only $12,000 as owed Allen Rothenberg, without indicating that interest was owed. This is in contrast to a claim on another property, where the principal together with interest were listed as disputed obligations. It could be concluded that she viewed Allen Rothenberg's Note as not including any interest obligation. However, the court views the schedules as simply evidencing sloppiness and inattention on her part.

Similarly, Allen Rothenberg wrote a letter to the Internal Revenue Service in 1985 regarding the amount owed on his claim and only asserted annual adjustments for the CPI from 1976 to 1985, without any assertion of interest. The court views this as a basis for doubting his recollection of the terms of the Agreement, which he admitted was "hazy." The court does not believe that this isolated communication is an appropriate basis for following the rule quoted in *Green v. Obergfell,* 73 App.D.C. 298, 121 F.2d 46, 60 n. 39 (1940), *cert. denied,* 314 U.S. 637, 62 S.Ct. 72, 86 L.Ed. 511 (1941), that "generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." Santoli's testimony was based on an obviously clearer recollection of events and outweighs whatever inferences might be drawn from Allen Rothenberg's communication to the Internal Revenue Service.

## II. INAPPLICABILITY OF USURY STATUTE CAP TO POST–MATURITY INTEREST

In Allen Rothenberg's Note, the parties agreed orally or in writing to three categories of post-maturity interest. First, interest was to be paid annually after maturity on any unpaid balance (including unpaid CPI adjustments). Second, interest was to be paid annually on each installment of such interest. Third, interest was to be paid on any expenditures Allen Rothenberg made to protect or enforce his lien.

The Note and the deed of trust refer to the rate of interest with respect to only the latter two categories of interest. In the case of interest upon installments of interest, the rate is to be "the highest legal rate." In the case of interest on expenditures, interest is to be the "full legal rate." However, the Note does not specify the rate of interest that was to be paid on the first of the three categories, the interest on the unpaid balance after maturity.

It is not even clear from the Note what interest was being referred to as "installments of interest." The only installment payments required by the Note's language which could be considered interest were installments of CPI adjustments. If the evidence were limited to the Note itself, the most logical interpretation of the Note is that the CPI adjustments are a substitute form of interest in place of a fixed rate of interest. Another possible interpretation (without resort to the oral testimony) is that the parties were referring to the 6 percent rate of interest that the Note would bear under D.C.Code § 28–3302(a) in the absence of a contract expressing the rate. It is only by resort to the oral testimony that the rate of interest can be fixed as "the highest legal rate."

In deciding what "the highest legal rate" is under these circumstances, a threshold question is whether the District of Columbia usury statute (D.C.Code § 28–3303) limits the

interest rate to which the parties could have legally agreed. Since the interest rate in question is to be applied post-maturity, it has to be decided whether the statute applies to post-maturity interest.

■ The issue appears to be one of first impression in this jurisdiction. The only case pertaining to the application of the usury law to post-maturity interest in the District of Columbia seems to be *May v. Shepherd,* 1 Mackey 430 (D.C.1882), *affirmed without discussion on this point,* 115 U.S. 505, 6 S.Ct. 119, 29 L.Ed. 456 (1885) (holding that the 6 percent statutory limit on interest in verbal agreements applied to an agreement for post-default interest). However, the provision for interest after maturity in that case was made after the Note in question had become due, and so it was in the nature of a new contract for the forbearance of money. Thus, the ruling in that case is of little help in deciding the present issue. The question whether a transaction is usurious must be decided as of the time of the transaction. *First American Title Insurance & Trust Co. v. Cook,* 12 Cal.App.3d 592, 90 Cal.Rptr. 645 (1970).

The authorities in other jurisdictions are divided as to the applicability of usury statutes to post-maturity interest. In some jurisdictions the statutes contain explicit provisions as to post-maturity interest. *Baker v. Loves Park Savings & Loan Association,* 61 Ill.2d 119, 333 N.E.2d 1 (1975) (early Illinois cases permitted charging post-maturity interest in excess of the maximum amount authorized by the statute, but in 1879 the legislature enacted a statute prohibiting contracting for the payment of the rate of interest in excess of the lawful rate by reason of nonpayment at maturity); *Investors Syndicate v. Baskerville Bros. Holding Co.,* 200 Minn. 461, 274 N.W. 627 (1937) (under the Minnesota statute, the highest rate of interest permitted after maturity is the rate of interest which is charged before maturity); *Reichwein v. Kirshenbaum,* 98 R.I. 340, 201 A.2d 918 (1964) (Rhode Island usury statute is unique in that it expressly provides that its limit on allowable interest rate applies both before and after maturity of the loan); *Oil Investment, Inc. v. Dallea Petroleum Corp.,*

152 N.W.2d 415 (N.D.1967) (North Dakota usury statute does not apply to interest after maturity, but another statute limits the post-maturity interest rate to the rate charged before maturity); *Paulat v. Pirello,* 353 So.2d 1307 (La.1977); *Karmgard v. Southland Mortgage & Title Co.,* 341 So.2d 1109 (La.1977); *Thrift Funds of Baton Rouge v. Jones,* 274 So.2d 150 (La.1973).

However, in most jurisdictions, including the District of Columbia, the statutes do not explicitly refer to interest after maturity. In these cases, the applicability of the usury statute to post-maturity interest is a matter of interpretation and public policy.

Some of the differences in the interpretation can be explained by the differences in the language of the statutes. Thus, a reference in the usury statute to compensation for "retention" or "detention" of money has been held to bring post-maturity interest within the ambit of the statute. *Parks v. Lubbock,* 92 Tex. 635, 51 S.W. 322 (1899) (under the Texas statute, usury is contracting for, charging or receiving interest in excess of the amount allowed by the law and interest is compensation for the use or forbearance or detention of money, and the court held that the legislature's purpose in using the word "detention" in the definition of interest was to meet the case when the debtor should detain the money beyond the stipulated period of forbearance, making the statute applicable to contractual provisions as to defaults, as well as loans and forbearance); *Ulvilden v. Sorken,* 58 S.D. 466, 237 N.W. 565 (1931) (the South Dakota usury statute prescribes the highest rate of interest which it is lawful to take, receive, retain or contract for in the state, and the court interpreted the language of the statute as applying to post-maturity interest); *Scarr v. Boyer,* 250 Mont. 248, 818 P.2d 381 (1991) (the Montana statute defines interest as compensation allowed by law or fixed by the parties for the use or forbearance or detention of money, and the court followed the reasoning of the courts in South Dakota and Texas holding that the legislature intended to make the usury law applicable post-maturity).

The absence of language limiting interest for the "detention" of money in the usury

statute has been construed as precluding limitations on interest charged post-maturity based on the statute. *Smith Machinery Co., Inc. v. Jenkins,* 654 F.2d 693 (10th Cir.1981) (in interpreting the New Mexico statute, which limits the amount of interest, discount or other advantage that can be taken, reserved, received or charged for the loan of money or credit or the forbearance or postponement of the right to receive money or credit, the court pointed out that all the terms of the statute denote consensual agreements between the parties, indicating that a withholding or detention of money by the borrower not consented to by the lender is not within the statute's purview).

■ The courts generally have held that in the absence of language in the usury statute that compels a different conclusion, the limitations on interest rates charged do not apply post-maturity. *See* 28 A.L.R. 449, 452 (1969); 91 C.J.S. § 31, 608–611 (1955). This appears to be the view prevailing in the majority of jurisdictions which have ruled on the issue. The rationale for this is that stipulations providing that an obligation shall draw after maturity a greater rate of interest than permitted by statute are regarded as penalties to induce prompt payment, penalties which the debtor may avoid by paying when due and, therefore, are not usurious. *Lloyd v. Scott,* 29 U.S. (4 Pet.) 205, 7 L.Ed. 833 (1830); *Sumner v. People,* 29 N.Y. 337 (1864); *Cutler v. How,* 8 Mass. 257 (1811); *Floyer v. Edwards,* 1 Cowp. 112, 98 Eng.Rep. 995 (1774); *Rogers v. Sample,* 33 Miss. 310 (1857); *Chaffe & Sons v. Landers,* 46 Ark. 364 (1885). A debtor may not, by his voluntary act, render a transaction usurious which, but for such circumstances, would be entirely free from a claim of usury. 91 C.J.S. § 31, at 609.

Among the jurisdictions which follow this reasoning and hold that the usury statute does not limit post-maturity interest contracted for by the parties (acting in good faith and without intent to evade usury laws) are: California (*First American Title Insurance & Trust Co. v. Cook,* 12 Cal.App.3d 592, 90 Cal.Rptr. 645 (1970) (provision in a note imposing penalties for late payment, which together with interest exceeded the maximum charges allowable under the usury statute did not render the note usurious because the penalties were not regarded as interest)); Georgia (*Camilla Cotton Oil Co. v. Spencer Kellogg & Sons,* 257 F.2d 162 (5th Cir.1958); *but see Clark v. Kay,* 26 Ga. 403 (1858)); Idaho (*Easton v. Butterfield Live Stock Co.,* 48 Idaho 153, 279 P. 716 (1929); *Eagle Rock Corp. v. Idamont Hotel Co.,* 59 Idaho 413, 85 P.2d 242 (1938)); Michigan (*Eriksen v. Fisher,* 166 Mich.App. 439, 421 N.W.2d 193 (1988) (provision for post-maturity interest was held to be a late charge rather than a finance charge and, thus, was exempt from the usury statute limit applicable to contracts between private parties); *see also State Mutual Rodded Fire Insurance Co. v. Randall,* 232 Mich. 210, 205 N.W. 165 (1925)); New Jersey (*Loigman v. Keim,* 250 N.J.Super. 434, 594 A.2d 1364 (1991)); New York (*Klapper v. Integrated Agr. Management Co.,* 149 A.D.2d 765, 539 N.Y.S.2d 812 (1989); *Flynn v. Dick,* 13 A.D.2d 756, 215 N.Y.S.2d 382 (1961)); Oregon (*Law Guarantee & Trust Soc. Ltd. of London v. Hogue,* 37 Or. 544, 62 P. 380 (1900)); Utah (*United American Life Insurance Co. v. Willey,* 21 Utah 2d 279, 444 P.2d 755 (1968)), Washington (*Metro Hauling, Inc. v. Daffern,* 44 Wash.App. 719, 723 P.2d 32 (1986); *Union Bank v. Kruger,* 1 Wash. App. 622, 463 P.2d 273 (1968)); Wisconsin (*Randall v. Home Loan & Investment Co.,* 244 Wis. 623, 12 N.W.2d 915 (1944)).

The opposite rule, that the usury statute applies to post-maturity interest, seems to prevail in the minority of jurisdictions. The justification for such holding is usually that the purpose of a usury statute is to protect the borrower from the extortion of the excessive rate for the use of money and there is no reason why this protection should be limited to the term of the loan, especially in the circumstance when it is beyond the power of the borrower to promptly meet his obligation at maturity. *Ulvilden,* 237 N.W. at 566. Requiring the maker of a note to pay a higher rate of interest on the debt after maturity may be just as oppressive as being required to pay a higher rate during the term of the loan, and, in fact, it is often after default that the debtor has the greatest need for protection. *Scarr,* 250 Mont. at 252, 818 P.2d 381.

When the usury statute does not regulate post-maturity interest explicitly and does not contain references to "detention" of money or a similar language, the following jurisdictions nevertheless hold that the statute applies post-maturity: Massachusetts (*In re Rolfe*, 25 B.R. 89 (Bankr.D.Mass.1982) (default provisions are included within the ambit of the usury statute); *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167 (1980) (pointing out that the argument that higher interest after maturity does not have to pass muster under the usury statute because the debtor can avoid this interest by discharging his debt in a timely manner, rests on the assumption that persons who do not make timely payments are financially able to do so, but voluntarily choose not to pay); *but see Cutler v. How*, 8 Mass. 257 (1811)); Missouri (*J.I. Case Threshing Mach. Co. v. Tomlin*, 174 Mo.App. 512, 161 S.W. 286 (1913), *Long v. Long*, 141 Mo. 352, 44 S.W. 341 (1897)); Tennessee (*Richardson v. Brown*, 68 Tenn. 242 (1877) (the Tennessee statute, defining interest as compensation which may be demanded by the lender from the borrower, or the creditor from the debtor, for the use of money and limiting the interest rate at which parties might contract was interpreted by the court as limiting the interest which could be demanded for the period before, at the time, as well as after the obligation falls due)).

Some jurisdictions appear not to have addressed directly the issue of applicability of usury laws to post-maturity interest. The District of Columbia is one of them. The District of Columbia's usury statute, D.C.Code § 28–3303, provides:

If a person or corporation contracts in the District,

(1) verbally, to pay a greater rate of interest than 6 percent per annum, or

(2) in writing, to pay a greater rate than is permitted under section 28–3301 or 28–3308 or under chapter 36 of this subtitle,

the creditor shall forfeit the whole of the interest so contracted to be received.

■ Nothing in the language of the § 28–3303 indicates that it applies to "detention" or withholding of money. The court shares the view of the majority of authorities, as cited above, which hold that statutes worded similarly to the D.C. statute do not apply to post-maturity interest.[4]

In 1984, after the loan here was made, chapter 33 of title 28 of the D.C.Code was amended to add § 28–3311. New § 28–3311(a) provides that for purposes of chapter 28 (which includes the usury provisions), "the word 'interest' means any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forbearance of money...." No mention is made of interest as a charge for the detention of money.

Moreover, new § 28–3311(b) provides that "[t]he rate of interest on any loan or financial transaction shall be calculated in compliance with the provisions of the Truth-in-Lending Act, as heretofore and hereafter amended, effective May 29, 1968 (82 Stat. 146; 15 U.S.C. 1601 et seq.), and the regulations and interpretations thereunder." As stated in *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir.1992), "[t]he purpose of the Truth in Lending Act is 'to assure a meaningful disclosure of *credit* terms.' 15 U.S.C. § 1601(a) (1988) (emphasis added). [A] damages provision [which] establishes the damages due upon default ... is not a credit provision. Under the Truth in Lending Regulations, charges for default are not finance charges. *See* 12 C.F.R. § 226.4(c)(2) (1992)." Under 15 U.S.C. § 1606(a)(1)(A) the annual percentage rate applicable to any extension of credit (other than under an open end credit plan (which the note here was not)) is determined based on the "finance charge" imposed.

Accordingly, it is evident under the usury provisions as modified by § 28–3311 that the

---

4. That the District of Columbia would follow the majority rule might be inferred from *Pazianos v. Schenker*, 366 A.2d 440 (D.C.1976), wherein the court held that in determining whether a fee makes a loan usurious, the fee is to be prorated over the entire payment period. By focusing on the pre-maturity period, the *Pazianos* court appears to view that period as the critical time frame. *See also Kass v. Garfinckel, Brooks Brothers, Miller & Rhoads, Inc.*, 299 A.2d 542 (D.C. 1973) (open ended revolving charge account agreement providing for interest rate above the usury statute limit was not usurious).

usury limitations on interest only apply to pre-maturity interest. Even if § 28–3311 were not retroactive (an issue this court does not decide), it would still shed light on what was intended when the term "interest" was used in the usury provisions. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The court holds that § 28–3303 does not limit the interest rate that the parties to a contract for payment of money may agree to be charged after maturity of the obligation.

Consequently, the oral agreement between Allen and Barbara Rothenberg as to the interest rate applicable to unpaid balance due on the Note at the time of its maturity is not subject to the 6 percent limit on verbal contracts prescribed by the District of Columbia usury statute. The parties could have legally agreed to any rate of interest, provided that it is conscionable and bargained for in good faith. Here, the court has determined that the rate they agreed to orally was "the highest legal rate," which is the same rate as the interest rate agreed to in writing applicable to "installments of interest" after maturity.

### III. MEANING OF THE AGREEMENT TO PAY "THE HIGHEST LEGAL RATE" OF INTEREST

The Note, the deed of trust and the oral agreement fail to specify which "highest legal rate" of interest is to apply to each of these three components of interest. Is it to be (1) the rate in effect when the Note was executed, (2) the rate in effect when the Note matured, or (3) those rates that applied at different times as the usury statute was amended during the post-maturity period? [5]

### A. *The Rothenbergs' Intention Based on the Circumstances*

The parties have stipulated that the maximum legal rate at which money could be lent in the District of Columbia was 8 percent in the years 1977 through 1979, 15 percent in the years 1980 through 1991, and 24 percent in the years 1992 through 1995.[6]

When the Note was executed in 1977, the District of Columbia usury statute had since 1920 set the fixed rate of 8 percent per annum as the legally allowable maximum rate of interest that could be contracted for in writing. *See In re Parkwood, Inc.,* 461 F.2d 158, 184 (D.C.Cir.1971). The statute did not contain a formula for computing the maximum rate of interest that would take into account the fluctuations in the market rate of interest. Accordingly, the District of Columbia statute stands in sharp contrast to the Alaska usury statute involved in *Riley v. Northern Commercial Co., Machinery Division,* 648 P.2d 961, 967 (Alaska 1982), which provided a formula tied to the market rates of interest for computing the maximum allowable interest rate. The parties in this case did not have in mind a statute under which the maximum legal interest rate would fluctuate.[7]

Both Allen and Barbara Rothenberg are well educated and intelligent. They had to be aware of variable rate mortgages. They did not choose to adopt a formula for the post-maturity interest rate tied to any fluctuations in the market rate or to changes in the statutory rates. The court does not find that they intended that the interest rate on any

---

5. The plaintiff has not contended that "highest legal rate" means simply the ordinary legal rate, and the court would reject that interpretation. *Riley v. Northern Commercial Co., Machinery Division,* 648 P.2d 961, 967 (Alaska 1982); *but see Universal C.I.T. Credit Corp. v. Ingel,* 347 Mass. 119, 196 N.E.2d 847, 851 (1964) ("highest lawful rate" construed as meaning the legal rate).

6. This stipulation appears to be in error. See *United States v. Walker,* 653 F.Supp. 818, 820 (S.D.W.Va.1987) (the maximum legal rate of interest permissible in the District of Columbia increased from 8 percent to 15 percent per year on November 20, 1979); *Zanville v. Garza,* 561 A.2d 1000, 1002 n. 5 (D.C.1989) (D.C.Code § 28–

3301(a) was amended effective March 14, 1984, by substituting "24" for "15", so that it became legal to negotiate a note bearing a 24 percent per year rate of interest). As will be seen, however, this error does not affect this decision.

7. Allen Rothenberg in 1985 took a position with the Internal Revenue Service that the Note was only subject to increases in the CPI, both pre- and post-maturity, which yields an average rate of much less than the 8 percent per annum. This suggests that he did not have in mind a note that would bear interest at 15 percent or 24 percent, which the usury statute fixed as the maximum rates of interest in 1979 and 1984, respectively.

component of the Note would reach 15 percent or 24 percent if the usury statute were amended to provide for such maximum rates of interest.

There is no evidence that in January 1977 the parties saw any necessity to address alteration of the interest rate if the maximum legal rate were to change after the Note's execution. There is no evidence that Allen Rothenberg ever stated in the negotiations that he contemplated the possibility that the post-maturity interest rate could be higher than the maximum legal rate that was in effect when the Note was executed. He had the opportunity to bargain for a fluctuating rate if he wanted that. The agreement was that before maturity the Note would bear what was in effect a fluctuating rate of interest—adjustments to the Note's principal based on annual fluctuations in the CPI. By failing to express an intention that the post-maturity interest rate would similarly change if the existing highest legal rate changed, it may be inferred that a fixed rate was intended.

From Barbara Rothenberg's perspective in January 1977, it is unlikely that she agreed that the Note's post-maturity interest could change from time to time as the usury statute was amended. As a real estate broker, she had to be familiar with variable interest rates and would have expected the Note to recite that the interest rate would change whenever the maximum legal rate were to change.

It appears that a change in the maximum legal interest rate after execution of the Note was simply not a topic that the parties discussed when making the Agreement. They wanted an amicable divorce, and there is no reason to believe that the parties considered that an interest rate of 24 percent could be collected if the usury statute were amended to make that the maximum legal rate. The parties could not expect that Barbara Rothenberg would continue to live in the house without paying the Note, when she could avoid the accumulation of interest by simply selling the house and realizing its equity. Likewise, from Allen Rothenberg's perspective in January 1977, he was protected against any future dramatic changes in interest rates because he had the right to foreclose on the house. The property has substantial equity except for the third deed of trust that RDK acquired against the property long after the Rothenbergs' Agreement in 1977.

Why then has Barbara Rothenberg continued to live in the house without paying the Note? What has occurred is that Barbara Rothenberg has been discharged by reason of her bankruptcy from any personal obligation to Allen Rothenberg. She has developed a deep-seated animosity towards RDK. She has no equity left in the property and would rather see all of the eventual proceeds of the property go to Allen Rothenberg instead of going to RDK. This explains the anomalous posture of Barbara Rothenberg not contesting Allen Rothenberg's interpretation of the Note which ordinarily would be adverse to her interests. She is content to continue living in the house with interest accruing in substantial amounts on Allen Rothenberg's claim because she will have no personal obligation to pay it, while the amount that RDK recovers is minimized.

The testimony of Allen Rothenberg and Santoli does not establish that the parties orally agreed that "the highest legal rate" was to be a variable rate. Allen Rothenberg testified only as follows regarding the rate of interest:

Q: What was to be the rate of interest?

A: Whatever the highest rate was in the District.

Trial Tr. p. 56.

Allen Rothenberg clearly did not focus on an interest rate that would be dictated by future amendments to the usury statute. If the parties had discussed such contingency, it is likely that Allen Rothenberg would have more clearly recalled the deal when he wrote to the Internal Revenue Service in 1985 and asserted that no interest based on the statutory maximum rate was due on the Note. This confirms the court's view that the adoption of "the highest legal rate" was not a term the parties attempted to define at the bargaining table. They simply agreed to that term without attempting to define it.

Santoli said in his testimony that the Note more accurately should have stated that it was to bear interest after the maturity date at the maximum legal rate and that the interest was to be compounded annually. Trial Tr. at p. 80 lines 20–25. When the court inquired of Santoli whether the parties discussed the question of usury, he responded that they did not, and added that there was no set rate they specified for interest, but that Allen Rothenberg had said that he should get the maximum amount he would be entitled to get, rather than trying to peg it at a particular rate. Trial Tr. p. 81.

There is no evidence that in January 1977 the parties and Santoli were aware that 8 percent was the precise maximum non-usurious rate then in effect, or that if they were aware of it, they knew that they could charge that maximum rate post-maturity and compound it as well without running afoul of the usury statute. Rather than stating a specific rate (and encountering issues as to whether that was usurious), they settled on simply letting the rate be expressed as "the highest legal rate." There is no evidence that they were focusing on the highest legal rate that might be enacted in the future or even understood that they could adopt such rate.

The court's findings are not altered by the following testimony by Santoli:

Q: You were trying to effectuate the parties' intentions when you said that "Each installment of interest to bear interest after maturity, if not then paid, at the highest legal rate." What does "each installment of interest" refer to?

A: It meant that every year if there was no payment that was made we would add the interest at whatever the rate was on the anniversary date of that particular payment. Trial Tr. at p. 76.

The court finds this testimony ambiguous because it could be interpreted as meaning that whatever the maximum rate of interest was, it was to be added to interest "on the anniversary date" of the payment. The ambiguity was heightened when Santoli testified that—". . . if she owed $15,000 on December 31, [1979], and that was what the adjusted amount after CPI was, and she didn't pay it,

and the maximum legal rate was 10 percent, then it would be 10 percent of $15,000, and then the next year after that it would be 10 percent of $15,000 plus 10 percent." Trial Tr. at p. 79. If the rate was one that was variable from the anniversary date, you would expect Santoli to have indicated that the 10 percent rate might vary.

Moreover, even if Santoli's testimony (quoted above from page 76 of the transcript) meant that on the anniversary date of the particular payment interest was to be added at the maximum rate in effect on that particular date, the court would not find this testimony credible.

First, it is not clear whether his testimony is addressed to what he thought the Note meant or what the parties actually expressed to him in the negotiations. He is a friend of Allen Rothenberg and has an obvious reason and almost unfettered leeway to testify favorably for Allen Rothenberg regarding what he thinks the Note ought to mean, as opposed to what the parties actually said in January 1977.

Second, Santoli's recollection goes back almost 20 years and in the interim he has had no occasion to discuss the matter with anyone until he spoke before the trial with Allen Rothenberg's counsel. Santoli described nothing that would have served to refresh his recollection on this particular detail of the negotiations. Without some explanation of how he could remember that the parties expressly stated that they wanted the rate of interest to vary as the maximum legal rate changed under the usury statute, the court does not credit his recollection on this point. If it had been discussed that the interest rate was to vary as the usury statute was amended in the future to change the maximum legal rate, it would have become obvious to the drafter of the Note that there was an ambiguity in the phrase "the highest legal rate." Santoli's failure to explain why he made no clarification to the phrase weighs against crediting any recollection that the parties orally agreed that the rate would vary in that fashion.

Furthermore, the language Santoli used to express the parties' Agreement referred to "the highest legal rate," not the "highest

legal rates." This is in contrast to the provision referring to adjustments based on the "consumer price indexes." In his testimony, Santoli did not address the possibility that the interest rate was to vary from time to time despite extensive examination concerning what Allen and Barbara Rothenberg said in their conversations with him leading to his drafting of the Note and the deed of trust. Had the parties intended the interest rates to change from time to time, it is likely he would recall that, and that he would have clarified that point in the Note.

The circumstances are all indicative of the fact that "the highest legal rate" that the parties envisioned was the fixed rate prevailing when they executed the Note. They were bargaining in the context of a fixed rate usury statute, and they had in mind a fixed maximum rate for the interest allowed to be charged on loans under the statute. The court finds that "the highest legal rate" that the parties intended is the 8 percent set forth in the usury statute at the time the Note was executed. *See Mucklar v. Cross*, 32 N.J.L. 423 (1868) (dicta); *Wyckoff v. Wyckoff*, 44 N.J.Eq. 56, 13 A. 662 (1888) (provision for lawful interest to be paid on certain bonds was not affected by legislative reduction of the lawful rate during the term of the obligation); *Clark v. Walker–Kurth Lumber Co.*, 689 S.W.2d 275 (Tex.App.1985) (promise to pay interest at "the full legal rate" constituted agreement to pay interest at the highest rate allowable by law on the date of the agreement).

This interpretation is also consistent with the court's concern that applying the current maximum rate under the District of Columbia usury statute, which is 24 percent, a rate wholly unforeseen by the parties in 1977, would constitute an unenforceable penalty. "It is well settled in this jurisdiction that charges which constitute penalties (that is, which have no reasonable relationship to any actual damages foreseeable at the time of contracting) are unconscionable and void."

*In re Wright*, 51 B.R. 669 (Bankr.D.D.C. 1985). "The increase in the interest rate may be justified as a liquidated damage provision only if the amount stipulated is proportionate to any damages reasonably to be anticipated in the circumstances." *In re Tastyeast, Inc.*, 126 F.2d 879, 882 (3rd Cir. 1942), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942), quoting *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 226, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930). *See also Feller v. Architects Display Buildings*, 54 N.J.Super. 205, 148 A.2d 634 (1959) (it is not illegal to provide for a higher rate of interest after maturity, but if such rate is unconscionably high, it will be unenforceable because it amounts to penalty).

■ Further, this interpretation is equitable under the circumstances. Oral agreements to pay interest at the highest legal rate involve dangers that D.C.Code §§ 28–3302(a) and 28–3303 are aimed at controlling (in the case of pre-maturity rates of interest). Such oral agreements impose great risks of disputes arising between the contracting parties as to what was really agreed to. The oral contract here was at least ambiguous. No clear evidence was presented to resolve the ambiguities in the Rothenbergs' oral and written agreements.[8]

The parties testified that the Agreement was intended to treat Barbara Rothenberg fairly. Trial Tr. 78, lines 6–9. To impose the 24 percent per annum rate that the usury statute now allows would have been viewed by the parties as unfair in 1977. A 24 percent rate of interest today is disproportionate to the 8 percent rate of interest that applied in 1977. The parties were not thinking of subjecting themselves to the whims of the legislature. The rate in effect when the Note was executed is equitable because it would have protected Allen Rothenberg, if the rate prescribed by the District of Columbia usury statute went down (cf. *Wyckoff*, supra), and it protects Barbara Rothenberg

---

8. In the District of Columbia, when a contract recites a rate of interest until maturity but is silent regarding the rate after maturity, the legal rate applies. *Holden v. Savings & Trust Co.*, 100 U.S. 72, 25 L.Ed. 567 (1879). Where a note leaves blank the rate of interest after maturity, the legal rate applies. *Wieland v. Loon*, 79 S.D. 608, 116 N.W.2d 391 (1962). If the parties' oral agreement were not given force by the court, the applicable *post-maturity* rate would be 6 percent per annum.

against the unpredictable increase in the rate to 24 percent.

### B. *The Maximum Rate in Effect on the Maturity Date Was Not Intended*

As the foregoing shows, the controlling maximum non-usurious rate agreed to was not such rate as was in effect when the Note matured. Use of the interest rate as of the maturity date could lead to absurd results if the legislature were to move the date when a new rate is fixed by one day. To wit, the Note matured on December 31, 1979. According to the parties' stipulation, the maximum non-usurious interest rate was then 8 percent. The parties also stipulated that the next day, January 1, 1980, the maximum rate climbed to 15 percent.[9] The parties certainly did not contemplate when they executed the Note that the fickleness of the legislature in picking January 1, 1980, instead of December 31, 1979, as the date on which the amended statute would be effective, to control whether the Note bore 8 percent interest or 15 percent interest.

The court's interpretation of the parties' Agreement is not inconsistent with the holding in *Riley v. Northern Commercial Co., Machinery Division,* 648 P.2d 961 (Alaska 1982). There the promissory note executed in December 1975 provided that Riley would pay "interest after maturity at the highest lawful contract rate." The note matured on July 2, 1976. The usury statute in effect at maturity provided: "No interest may be charged by express agreement of the parties in a contract or loan commitment dated after June 4, 1976 which is more than five percentage points above the annual rate charged member banks for advances by the 12th Federal Reserve District that prevailed on the 25th day of the month preceding the commencement of the calendar quarter during which the contract or loan commitment is made." *Riley,* 648 P.2d at 967 n. 15. Under this statute, 9½ percent was the maximum legal rate in effect on the note's maturity date of July 2, 1976. This rate (and the

statutory formula for its computation) differed from the maximum rate in effect on the note's execution date in December 1975, and the rate also undoubtedly changed from time to time after maturity. The court in *Riley* had no difficulty in concluding that the note was to bear interest from the maturity date at the rate or 9½ percent in effect on that date. Indeed, the court concluded that "in the present context the contractual provision—interest after maturity at the highest lawful rate—is not ambiguous." *Id.* at 967 n. 16. The court agreed with the trial court's determination that the note required Riley to pay interest at the highest rate sanctioned by the Alaska usury statute on the date of maturity, and rejected Riley's contention that "interest should be determined by reference to [the Alaska usury statute] as it existed at the time the contract was executed, not when the debt matured." *Id.* at 967. But the court reached its conclusion in the context of its determination that there was an "express agreement ... to set interest at the highest rate sanctioned by application of the variable interest rate formula" and its view that there was a need "in an era of interest rate instability [not to] unduly impair the ability of parties to a commercial transaction to allocate the risk of nonperformance." *Id.* at 967.

This court holds that the contract between Allen and Barbara Rothenberg is different because of the fixed nature of the District of Columbia usury statute, the abundantly secured character of the claim, and the amicable divorce setting in which the Note was executed. There was no intention to give either party an advantage based on unpredictable change in the maximum rate allowed by the usury statute.

It should also be noted that the *Riley* holding, if applicable here, would limit Allen Rothenberg to the maximum rate in effect on the maturity date, which by the parties' stipulation,[10] was 8 percent just as on the execution date. *Riley* would preclude resort to the maximum rates under the usury statute as

---

**9.** As discussed at n. 6, supra, the parties stipulation appears to be in error. But for the purposes of interpreting the defendants' argument, this stipulation provides a useful hypothetical for demonstrating the absurdity of a conclusion that

the rate of interest should be fixed at maturity instead of at execution of the Note.

**10.** See n. 6, supra.

these rates changed from time to time after maturity.

### C. *Interest on Expenditures*

The court holds that the interest under the deed of trust on expenditures to protect the lien should be at the rate of interest in effect when the expenditures were made. Unlike the original loan—a done deed when the monies are lent—expenditures are like a new loan forced to be made by the lender at a future date. When the lender is forced to expend funds at a later stage, that is equivalent to a new loan and the appropriate interpretation of "full legal interest" is the maximum usury rate in effect when demand is made for payment of the funds advanced.

### D. *Conclusion*

For the above reasons, the court concludes that the reference by the parties to "the highest legal rate" means the 8 percent maximum in effect on the date of the execution of the Note. The same meaning applies to the term "full legal interest" in the deed of trust. The rate of 8 percent per annum applies to the unpaid balance on the loan on the maturity date. In spite of the fact that it was agreed to orally, it is not limited by the District of Columbia usury statute, because the statute does not apply to post-maturity interest. In the case of interest on installments of interest and interest on expenditures made to protect or enforce the deed of trust, the parties agreed in writing to interest at "the highest legal rate" or, equivalently, "full legal interest" and, accordingly, Allen Rothenberg is entitled to the maximum non-usurious rate of interest in the case of these two categories of interest as well. The rate of 8 percent per annum applies to the unpaid balance on the loan on the maturity date and to the installments of interest that the Note was to bear after maturity. In the case of expenditures incurred to protect the lien, the applicable rate is the highest legal rate in effect when demand for reimbursement of the expenditure was made.

## IV. OTHER ISSUES

### A. *Compound Interest*

The plaintiff urges that compound interest is not appropriate in this case under the rule that "where the contract does not specifically require compound interest, we are reluctant to imply such a term absent a showing of an agreement between the parties, particularly a term in aid of the party that drafted the writing." *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293, 1304 (D.C.1979). The court, however, has found that there was an agreement to treat interest as owed in annual installments and for each installment of interest to bear interest at the highest legal rate. The Note did not provide for compounding at the fullest extent possible because there was no provision for the interest charged on interest itself to bear interest.[11]

This agreement for limited compounding must be given effect. The parties' Agreement may not be a model of clarity, but once the court has found by preponderance of the evidence that such a contract existed, that satisfies the requirement. As the plaintiff concedes, compounding of interest does not create usury, *Oliver v. Decatur,* 4 D.C. (4 Cranch) 461, 18 F.Cas. 656 (D.C.Cir.1834), and, in any event, this was post-maturity interest unaffected by the usury statute.

However, the parties reached an agreement for compounding of interest only in the case of interest owed on the Note itself. They did not reach any agreement for compounding of interest owed on expenditures that Allen Rothenberg made to protect or enforce his lien. The Agreement as to interest on such expenditures was set forth in the deed of trust itself, not the Note, and the deed of trust did not incorporate the Note's compounding provisions.

### B. *Scheduled Amount*

 The plaintiff next contends that Allen Rothenberg should be limited to the amount for which he was scheduled by the debtor in her bankruptcy filing. Allen Rothenberg's claim was scheduled as secured in the

---

11. So principal—that is, the total amount of original principal plus CPI adjustments remaining owed at maturity—is to bear simple interest at 8 percent per annum. At the end of the year, the annual installment of interest owed would itself bear simple interest at 8 percent per annum.

amount of $12,000. He never filed a proof of claim. The debtor's confirmed plan merely states that his claim is to be unimpaired, which means that the plan leaves unaltered the legal, equitable and contractual rights to which such claim entitled Allen Rothenberg. 11 U.S.C. § 1124(1).

The scheduling of Allen Rothenberg's lien claim had no effect on that lien. The holder of an unsecured claim scheduled in the wrong amount who fails to file a proof of claim can only collect the amount scheduled by the debtor in determining how much the creditor receives under the plan. Additionally, the creditor's claim is discharged under 11 U.S.C. § 1141(d)(1)(A). But a lien claim left unimpaired by a plan is unaffected by the plan and by the chapter 11 discharge. The plaintiff has failed to establish an exception to Allen Rothenberg's lien coming within the general principle that liens pass through bankruptcy unaffected. *Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886); *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Its being scheduled in an erroneous amount by the debtor has no effect on the lien.

### C. Integration Clause and Parol Evidence

The plaintiff further urges that the agreement to pay interest on the Note is at variance with the divorce settlement's integration clause and violates the parol evidence rule. Because it is a subsequent agreement, the agreement for interest to be paid at the highest rate and for a limited form of annual compounding are not voided by the settlement Agreement's integration clause. The written Note is plainly ambiguous, thus allowing resort to the oral evidence. *Davis v. Chevy Chase Financial, Ltd.,* 667 F.2d 160, 170 (D.C.Cir.1981) ("where a contract is not 'wholly unambiguous,' the parties have the right under principles of American contract law to present oral testimony and other extrinsic material to aid in its interpretation"). Parol evidence may be admitted to explain ambiguous language of a contract, or to show a contemporaneous agreement in addition to and not inconsistent with or a variation of the written agreement between the same parties,

or where the parties did not adopt the writing as a statement of their whole agreement. *Stamenich v. Markovic,* 462 A.2d 452, 455 (D.C.1983). Accordingly, the oral agreement of the Rothenbergs does not run afoul of the rule that "a note must be paid according to its terms and cannot be altered by contradictory contemporaneous oral agreements." *Cusimano v. First Maryland Savings & Loan, Inc.,* 639 A.2d 553, 561 (D.C.1994). *See also Radiation Systems, Inc. v. Amplicon, Inc.,* 882 F.Supp. 1101, 1103 (D.D.C. 1995). That rule has long been limited to the proposition that the absolute terms of a promissory note cannot be varied. *Brown v. Spofford,* 95 U.S. (5 Otto) 474, 481, 24 L.Ed. 508 (1877) (case arising under District of Columbia law); *Forsythe v. Kimball,* 91 U.S. (1 Otto) 291, 294, 23 L.Ed. 352 (1875); *Specht v. Howard,* 83 U.S. (16 Wall.) 564, 566, 21 L.Ed. 348 (1872).

### D. Patent Versus Latent

The plaintiff also urges that the rule in the District of Columbia long has been that "Extrinsic evidence is not admissible to explain a patent ambiguity, that is, one apparent on the face of the instrument, but is admissible to explain a latent ambiguity, that is, one not apparent on the face of the instrument, but one arising from extrinsic evidence...." *Harten v. Loffler,* 29 App. D.C. 490, 503, *aff'd,* 212 U.S. 397, 29 S.Ct. 351, 53 L.Ed. 568 (1909). But this statement in *Harten* was unnecessary dicta because the ambiguity involved was a latent ambiguity such that the extrinsic evidence was admissible even if the rule excluding extrinsic evidence to explain a patent ambiguity indeed applies in the District of Columbia. None of the cases cited in *Harten* actually hold that the rule applies in the District of Columbia, and no reported case has ever followed the quoted dicta in *Harten.*

Moreover, as the plaintiff concedes, the distinction between a patent and latent ambiguity has been abolished in the District of Columbia with respect to a testator's intent in a will. *Mitchell v. Merriam,* 88 U.S.App. D.C. 213, 188 F.2d 42, 44, *cert. denied,* 341 U.S. 935, 71 S.Ct. 855, 95 L.Ed. 1363 (1951); *In re Kerr's Estate,* 139 U.S.App.D.C. 321,

433 F.2d 479, 492 (1970). A will is the document satisfying the requirement that a testator's intent be expressed in writing. In contrast, many contracts are not required to be in writing and a written contract can be orally supplemented to add additional terms (as long as the parol evidence rule is satisfied). It would be anomalous to abolish the patent versus latent ambiguity distinction in the case of wills and not in the case of ordinary contracts.

Finally, District of Columbia case law has applied the parol evidence rule in a manner which would be inconsistent with the patent versus latent ambiguity distinction. For example, in holding that an instrument was ambiguous and that resort could be had to extrinsic evidence, the court in *America First Investment Corp. v. Goland,* 288 U.S.App.D.C. 298, 925 F.2d 1518, 1520 (1991), dealt with an instrument which was plainly ambiguous on its face—a patent ambiguity. Indeed, the parol evidence rule is often stated as being that the written language of a contract cannot be varied by extrinsic evidence if on its face the contract is unambiguous. *See, e.g., Horn & Hardart Co. v. Natl. R.R. Passenger Corp.,* 253 U.S.App.D.C. 285, 793 F.2d 356, 359 (1986). Accordingly, the court rejects the plaintiff's argument that the patent ambiguities in the Note here preclude resort to extrinsic evidence.

### E. *Statute of Frauds*

Finally, citing *Richards v. Holmes,* 59 U.S. (18 How.) 143, 15 L.Ed. 304 (1855), the plaintiff urges that the rule in the District of Columbia is that a deed of trust may be silent as to interest so long as the underlying promissory note states the interest rate. Accordingly, he argues that the oral agreements (1) for 8 percent per annum interest on the unpaid CPI-adjusted balance of principal owed at maturity and (2) for annual installments of interest are not enforceable. The court views this as a Statute of Frauds issue. *See* D.C.Code Ann. § 28–3503; *Fitzgan v. Burke,* 61 A.2d 721 (D.C.1948); *Harten,* 29 App.D.C. at 504. The parties have not adequately briefed this issue and shall file briefs within the time to be set at a scheduling conference.

## CONCLUSION

This ruling will be reflected in the court's final judgment once the court has resolved all other issues.